# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLIFTON S. FREEDMAN | ) | SEP 17  '04 |
| Plaintiff | ) | |
| | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 3:03 CV1048 (PCD) |
| | ) | |
| THE TOWN OF FAIRFIELD, DETECTIVE | ) | |
| WILLIAM YOUNG AND DETECTIVE DAVID | ) | |
| BENSEY (Individually and in their official | ) | |
| capacities as police officers for the Town of | ) | JULY 16, 2004 |
| Fairfield) | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Although their liability under the Electronic Communications Privacy Act has already been established, Defendants Town of Fairfield (the "Town"), Detective William Young ("Det. Young") and Detective David Bensey (Det. Bensey") (collectively the "Defendants") have moved for summary judgment on most of the remaining claims in the case. Most of their arguments are based upon a single factual premise, *viz.* that the "GoMaryGoAway" e-mail at the heart of this case constituted a "threat," which they investigated in good faith. They contend, therefore, that their conduct did not infringe the Plaintiff's ("Mr. Freedman") rights under the First and Fourth Amendments of the U.S. Constitution or comparable provisions of the Connecticut Constitution.

/32442/2/60954v2
07/16/04-SPT/

As set forth below, the factual premise of the Defendants' motion is hotly disputed. For that reason alone their motion must be denied. Contrary to that premise, the evidence shows that all of the parties involved in this case, including officers at the highest levels of the Fairfield Police Department, knew that the e-mail was a political satire, not a threat. The evidence further shows that the Defendants faxed America Online, Inc. ("AOL") a blatantly defective search warrant (a fact that the Defendants concede), not pursuant to a good faith investigation, but because they were doing a favor for Mary Carroll-Mirylees (the "Mary" referenced in the e-mail), who was a Fairfield Police Commissioner (*i.e.*, a member of the board with oversight authority for the police department) and a candidate for First Selectman.

## COUNTERSTATEMENT OF FACTS

### A.      The "Go John Go Away" and "Run Mary Run" Political Campaigns.

To fully appreciate the political/satirical nature of the e-mail at issue in this case, it is necessary to provide the Court with a brief bit of historical background about Fairfield politics, a history with which the Defendants and the individuals who filed the complaint in response to Mr. Freedman's e-mail were completely familiar.

In September 2001, Mary Carroll-Mirylees ran against incumbent John Metsopoulos in the 2001 Republican primary for the position of First Selectman in Fairfield. She lost the primary election. *See* Exhibit A at 37-38 (Freedman transcript); *see also* Exhibit B at 36 (Carroll-Mirylees transcript). Ms. Carroll-Mirylees' campaign included the phrase "Run Mary Run". *See* Exhibit A at 54 (Freedman transcript); *see also* Exhibit H at "Exhibit B" (plaintiff's initial disclosures); Exhibit B at 40 (Carroll-Mirylees transcript). This phrase was set forth on bumper stickers that were circulated during the summer of 2001. Exhibit B at 40

2

/32442/2/60954v2
07/16/04-SPT/

(Carroll-Mirylees transcript). After losing the primary, Ms. Carroll-Mirylees and her political supporters supported local Democratic party efforts to elect Ken Flatto (a Democrat) instead of Mr. Metsopoulos, during the general election for First Selectman in November 2001. *See* Exhibit A at 38, 42 (Freedman transcript). Ms. Carroll-Mirylees' campaign supporters included her campaign manager, Glendine Brandt ("DeeDee Brandt"), and Sandy Mulligan. *See* Exhibit B at 37 (Carroll-Mirylees transcript), *See* Exhibit A at 54 (Freedman transcript).

During the 2001 general election, the campaign against Mr. Metsopoulos included the widespread circulation of bumper stickers and other political paraphernalia bearing the political slogans "Go John Go Away, Your Days Are Numbered" and "Anybody But John." On at least one occasion, an airplane flew over Fairfield trailing a banner that said "Go John Go Away." In addition, a Fairfield firefighter created a website called "anybodybutjohn.com." *See* Exhibit A at 41 (Freedman transcript); *see also* Exhibit H at "Exhibit A" (plaintiff's initial disclosures). This campaign was also publicized in local papers including the *Fairfield Citizen* and the *Bridgeport Post*. *See* Exhibit K at 26 (Lyddy transcript).

Ms. Carroll-Mirylees was fully aware of this campaign and the associated political literature. *See* Exhibit B at 37-38, 40-41 (Carroll-Mirylees transcript). Ms. Brandt was also fully aware of the campaign. Exhibit C at 63-64 (Brandt transcript); Exhibit B at 37 (Carroll-Mirylees transcript). In fact, during her deposition Ms. Brandt specifically recalled the incident involving the airplane and newspaper reports and "a lot of discussion amongst the Town regarding" it. *Id.* at 64. Similarly, Ms. Mulligan knew about the "Go John Go Away" campaign. *See* Exhibit D at 32 (Young transcript) (where Young testified that Ms. Mulligan described it to him as a "smear tactic" so that "Metsopoulous was not reelected").

3

Even more importantly, members of the Fairfield Police Department, including Chief of Police Joseph Sambrook, Captain Paul Dyer, Lieutenant Christopher Lyddy, and Sergeant Eugene Palazzolo, were familiar with the "Go John Go Away" campaign. *See* Exhibit E at 16-17 (Palazzolo transcript); Exhibit F at 16-18 (Dyer transcript); Exhibit G at 18 (Sambrook transcript); Exhibit K at 26-28 (Lyddy transcript).

Notwithstanding the divisive effect that the actions of Ms. Carroll-Mirylees and her supporters had on the Fairfield Republican Party during the 2001 election, Ms. Carroll-Mirylees decided to run for First Selectman again in 2003 for the Republican Party. *See* Exhibit A at 38, 42, 45 (Freedman transcript).

**B.  The "GoMaryGoAway" E-mail.**

The meaning of Mr. Freedman's e-mail must be evaluated in light of the foregoing history of Fairfield politics, which, as noted, was known to the Defendants and relevant third parties.

Mr. Freedman was an active member of the Fairfield Republican Party and a member of the Fairfield Republican Town Committee from spring of 1993 to July of 2003. *See* Exhibit A at 35 (Freedman transcript). Mr. Freedman was also a supporter of incumbent John Metsopoulous. *Id.* at 40 (Freedman transcript).

On March 31, 2003, Mr. Freedman sent an e-mail, from his America Online account, to eighteen (18) members of the Fairfield Republican Party under the screen name GoMaryGoAway@aol.com with the message "The End is Near." Mr. Freedman sent this e-mail – an obvious political satire of the "Go John Go Away" campaign – as a result of his frustration with Ms. Carroll-Mirylees's divisive actions within the Republican Party. *Id.* at

4

/32442/2/60954v2
07/16/04-SPT/

37-51 (Freedman transcript). The recipients of the e-mail included Ms. Brandt and Ms. Mulligan. *Id.* at 54-55 (Freedman transcript).

Ms. Carroll-Mirylees learned of the e-mail from either Ms. Brandt or Ms. Mulligan, who called her shortly after receiving it. *See* Exhibit B at 42-44 (Carroll-Mirylees transcript). Ms. Carroll-Mirylees then called Chief of Police Sambrook about the e-mail, claiming that "some friends of hers had received an e-mail which they felt were threatening." Exhibit G at 16 (Sambrook transcript). ***Significantly, Ms. Carroll-Mirylees has been a Fairfield Police Commissioner since December 2001.*** Exhibit B at 8 (Carroll-Mirylees transcript). Chief Sambrook told Ms. Carroll-Mirylees that they should then file a report. *See* Exhibit G at 16 (Sambrook transcript). On or about April 1, 2003, Mulligan and Brandt filed a case/incident report with the Fairfield Police Department regarding the e-mail. *See* Exhibit I (defendant's initial disclosures).

## C. The Defendants Knew The GoMaryGoAway E-mail Was Political Satire.

Although the Defendants characterize the e-mail as a "threat" and contend that they cannot be charged with knowledge of its true character,[1] the evidence shows that the Ms. Mulligan and Ms. Brandt knew full well the e-mail's context and meaning. The similarities of the phrases "Go John Go Away" and "GoMaryGoAway" were undeniable in the Town of Fairfield. In fact, Ms. Mulligan admitted this to Det. Young. *See* Exhibit D at 32 (Young transcript).

More importantly for the purpose of this case, *the Defendants and their superiors in the Fairfield Police Department admitted that they understood the e-mail was political satire, not a*

---

[1] *See* Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment ("Def. Mem.") at 11, 14, 16-17.

5

threat. In fact, Captain Paul Dyer, the first police officer Ms. Mulligan contacted about this

e-mail after conferring with Ms. Carroll-Mirylees, also believed it was a political satire that

had been sent by a Fairfield firefighter (just like the "anybodybutjohn" website) when he spoke

with her about it:

> Q   Why didn't you ask [Sandy Mulligan] if she knew the identity of the
> sender?
>
> A   Frankly, I thought it was a fireman that sent that e-mail. *I was
> convinced it was a fireman because of the "go Mary, go away."* I'm not
> involved in politics, never have been, but a few years before this incident
> occurred I knew right then when Sandy [Mulligan] called a few years
> before that a fireman did what I thought was very childish and
> inappropriate, had bumper stickers made up that said "go John, go
> away," referring to John Metsopolous because they were feuding with
> him. And in my opinion, they got too involved in politics, that they
> shouldn't have been involved in, taking sides with who's going to be
> elected as first selectman.

Exhibit F at 16 (Dyer transcript) (emphasis added). Indeed, after speaking with Ms. Mulligan

about the e-mail, Capt. Dyer spoke with Police Chief Sambrook. Both men had a good laugh

over the e-mail:

> Q   On the day you received the call, did you ever speak with Chief
> Sambrook about the "go Mary, go away" - - about Ms. Mulligan's
> complaint?
>
> A   I spoke with him. I cannot remember if it was the same day or the next
> day. The initial conversation we had, again, was I told him, in private *I
> told him I'll bet you this is one of those firemen that did this by the
> screen name "go Mary, go away" and we chuckled about it.* He laughed
> too, he thought it was a fireman, too. . . .

Exhibit F at 18 (Dyer transcript) (emphasis added). Chief Sambrook confirmed that he

understood the political nature of the e-mail:

> Q   Does the phrase, "go Mary, go away," suggest anything to you in the
> political context of Fairfield?

6

A    I would have to go back to when John Metsopolous was feuding with [Mary Carroll-Mirylees]. There was some bad blood there and there were a lot of things that popped up in the paper about her relationship with him.

Q    Were you aware, just from the campaign literature, bumper stickers, a web site, that used the phrase "go John, go away"?

A    Yes sir.

Exhibit G at 18 (Sambrook transcript). Lieutenant Lyddy also testified that he immediately believed that the GoMaryGoAway e-mail was a parody of the "Go John Go Away" campaign and explained this to Sandy Mulligan:

Q    What, if anything, did you say to [Sandy Mulligan] about [the GoMaryGoAway email]?

A    I believe I drew a correlation that this could be a parody to the - - the political situation with the fire department a year or two ago.

Q    Meaning that it was a - - would that be the "Go John Go Away" parody?

A    Correct.

Exhibit K at 25-26 (Lyddy transcript).

After Captain Dyer spoke with Ms. Mulligan, responsibility for the case was passed down to Sergeant Palazzolo. He too immediately recognized the GoMaryGoAway e-mail as a satirical reference to the 2001 campaign against Mr. Metsopolous:

Q    And when you saw [the GoMaryGoAway] screen name, did you have any comment about it?

A    I believe I did.

Q    And what comment was that?

A    That it looked similar in structure to one that I was familiar with.

7

/32442/2/60954v2
07/16/04-SPT/

Q    To one e-mail or one saying or something else?

A    To a subscriber name - - Not a subscriber name, I'm sorry. One similar that I had seen in the past.

Q    One, meaning a screen name?

A    A screen name, correct.

Q    What other screen name was that?

A    One used by firefighters in Fairfield previously.

Q    What screen name was that?

A    Again, GoJohnGoAway, or something to that effect, utilized by the firefighters.

Exhibit E at 16-17 (Palazzolo transcript).

**D.    The Defendants' Unlawful Acquisition Of Mr. Freedman's AOL Subscriber Information.**

On April 1, 2003, Defendant William Young (the detective to whom Sergeant Palazzolo assigned direct responsibility for the case) interviewed Ms. Mulligan and Ms. Brandt about Mr. Freedman's e-mail. *See* Exhibit D at 34 (Young transcript). Det. Young met with both women at their homes, where they signed internet harassment forms. *See* Exhibit D at 41 (Young transcript); *See* Exhibit I (defendants' initial disclosures). As noted, the Defendants characterize the e-mail as a threat. Def. Mem. at 14, 16-17. However, Det. Young testified in his deposition that he never viewed the e-mail as a "threat[] to kill" or to "physically injure" anyone. *See* Exhibit D at 50 (Young transcript).[2]

---

[2] Similarly, Jennifer Sheridan, the America Online employee who responded to the warrant application once it was faxed to AOL, testified that she did not interpret the e-mail as a physical threat. *See* Exhibit J at 42-43 (Sheridan transcript).

/32442/2/609954v2
07/16/04-SPT/

On the same day, Det. Young completed a search and seizure warrant application. *See* Exhibit D at 42, 45 (Young transcript); Exhibit I (defendants' initial disclosures). The search and seizure warrant application specifically requested "subscriber information in the form of records, detailed billing information, screen names, applications for service, and date service provided pertaining to screen name "GoMaryGoAway". *See* Exhibit D at 47 (Young transcript); Exhibit I (defendants' initial disclosures). Det. Young asked his colleague, Det. David Bensey, to sign the application as a co-affiant. *See* Exhibit D at 11 (Young transcript). Det. Young then faxed the warrant application to AOL *without ever submitting it to a state's attorney or to a judge for approval*. *See* Exhibit D at 12 (Young transcript).

Det. Young's conduct in faxing the warrant application to AOL without first submitting it to a judge represented a departure from his past practice:

> Q    Have you been involved in any other cases where you had to obtain information from an Internet service provider like AOL?
>
> A    Oh, yes.
>
> Q    What procedure did you follow in these cases?
>
> A    It would depend on, as to what I was attempting to retrieve from -- whether it be Yahoo, AOL, Hot Mail, SNET. . . . If I was looking for subscriber information [from AOL], I would fax a signed search warrant to the AOL legal department directly.
>
> Q    And by signed, what did you mean? Who signed it?
>
> A    Judge.
>
>       . . .
>
> Q    Prior to April 1st, 2003, let's say in the one year, the 12-month period prior to April 1st, 2003, can you give me an estimate of how many times you sought non-content subscriber information from any ISP?
>
> A    Twice within the year prior to April 1st.

| Q | And what procedure did you follow on those occasions? |
|---|---|
| A | Presented the search warrant application to a judge, who signed it. |
| Q | Prior to April 1st, 2003, when you showed the warrant application to Detective Palazzolo, had you ever sought subscriber information, non-content from an ISP without submitting the warrant application to a judge? |
| A | No. |

Exhibit D at 18, 20-21 (Young transcript). Det. Young's conduct in this case was also inconsistent with the procedure set forth in a document that he had prepared describing the process for obtaining subscriber information from AOL. The document set forth that a *signed* warrant was required to obtain subscriber information from AOL. *See* Exhibit N (Sambrook Exhibit 1).[3]

Why did Det. Young depart from his customary practice in this particular case? According to Det. Young, he presented the search warrant application to his supervisor, Sgt. Palazzolo, who reviewed it to determine that the warrant application provided "probable cause." *See* Exhibit D at 13-14 (Young transcript); Exhibit E at 25 (Palazzolo transcript). Sgt. Palazzolo then told him that, because the warrant only sought subscriber information (as opposed to the content of an e-mail), it did not "need[] to be signed by a judge" and that "it could be forwarded directly to AOL legal". *See* Exhibit D at 12 (Young transcript). Although this procedure departed dramatically from Det. Young's prior practice, he never asked Sgt.

---

[3] Notably, although this document was responsive to Plaintiff's document requests, and should have been produced in response thereto, it was not. Instead, Plaintiff's counsel received the document "over the transom," from an anonymous source. However, Capt. Dyer and Chief Sambrook authenticated the signature of Lieutenant Christopher Lyddy, an individual with supervisory authority over Det. Young. *See* Exhibit G at 28-29 (Sambrook transcript); *see also* Exhibit F at 24-26 (Dyer transcript).

10

Palazzolo why he believed it was acceptable to fax the warrant application to AOL without first submitting it to a judge. Exhibit D at 17 (Young transcript).

Sgt. Palazzolo tells a very different story. He testified that, after he reviewed the warrant application, it was his understanding that Det. Young would submit the application to the Loudoun County, Virginia sheriff's department. (AOL is located in Loudoun County). A Loudoun County magistrate would then review the application and, if acceptable, issue a Loudoun County warrant to AOL. *See* Exhibit E at 27-28 (Palazzolo transcript).

It is not possible to reconcile the testimony of these two police officers. One of them – and a jury will have to decide which one – is attempting to shift blame to the other for the manifestly unlawful conduct at issue in this case.

On April 7, 2003, notwithstanding the obvious absence of a judge's signature on the search warrant that Det. Young faxed to AOL, AOL responded by faxing the requested information to the Fairfield Police Department. *See* Exhibit H (plaintiff's initial disclosures); *see also* Exhibit I (defendants' initial disclosures). The Defendants then publicly disclosed Mr. Freedman's subscriber information.

**E.    The Fairfield Police Department Failed Properly To Train The Defendants.**

Mr. Freedman alleges in his lawsuit that the Town of Fairfield failed properly to train its police officers concerning the proper means to obtain information from an internet service provider. Accordingly, this section of the brief describes the contradictory and confusing testimony of the Defendants' own witnesses, which include high ranking officers within the department, concerning training.

Capt. Dyer testified that Det. Young told him that it was AOL's policy to have officers send unsigned search warrant applications to them for subscriber information. *See* Exhibit F at 24 (Dyer transcript). Chief Sambrook testified that Capt. Dyer told him that this was AOL's policy as well. *See* Exhibit G at 26-27 (Sambrook transcript). In fact, Chief Sambrook testified that Capt. Dyer told him that this was AOL's long-standing policy:

> Q    Did [Capt. Dyer] tell you where he - - how it is he came to have that belief?
>
> A    If my memory serves me, I believe he said that that's the procedure That AOL hade always used and that it had been questioned in the past and that it was never challenged and that that's the way they operate and it was acceptable.

*See* Exhibit G at 26-27 (Sambrook transcript).

However, as noted, Det. Young testified that he had requested subscriber information from ISPs, including AOL, numerous times in the past, and that during each of these requests, he presented the warrant application to a Connecticut judge. *See supra* at 9-10. It was only during one other occasion, immediately after this incident, that Det. Young faxed an unsigned search warrant application for subscriber information from AOL. *See* Exhibit D at 19-20 (Young transcript). Notably, this procedure of sending an unsigned warrant was contrary to the procedure set forth in a document *prepared by Det. Young* on obtaining information from AOL. *See* Exhibit N (Sambrook Exhibit 1).

Finally, based upon Sgt. Palazzolo's testimony, the Fairfield Police Department's policy regarding obtaining subscriber information from ISPs required a police officer to forward a Connecticut search warrant application to the Loudoun County, Va. Sheriff's office, where it would then be transcribed into a Loudoun County warrant.

/32442/2/60954v2
07/16/04-SPT/

12

The Fairfield Police Department has no training courses concerning the legal requirements for requesting subscriber information from ISPs. *See* Exhibit E at 37 (Palazzolo transcript); *see also* Exhibit G at 24 (Sambrook transcript). The Fairfield Police Department also has no requirements for any officer or detective to attend any outside seminar on internet crime. *See* Exhibit E at 43 (Palazzolo transcript). Sgt. Palazzolo, the officer that supervised Det. Young for this matter, received his only "training" in this area from what he stated would be "best described as a quasi-training symposium" and "more of an expo than a training exercise" at a convention held at the Foxwoods casino. *See* Exhibit E at 38-39 (Palazzolo transcript). Moreover, whenever a legal issue arose, officers within the department would conduct their own research and would then proceed with it without any confirmation of their findings. *See* Exhibit E at 49 (Palazzolo transcript).

## ARGUMENT

### I. THE DEFENDANTS VIOLATED THE PLAINTIFF'S RIGHTS UNDER THE FOURTH AMENDMENT.

#### A. Mr. Freedman Had A Reasonable Expectation Of Privacy In His AOL Screen Name.

To establish a claim under the Fourth Amendment, the parties agree that Mr. Freedman must establish that he had a subjective expectation of privacy in his identity as the sender of the "GoMaryGoAway" e-mail and that his expectation was one that society deems reasonable. Mr. Freedman had a subjective expectation of privacy in his identity as the sender of the e-mail. The Defendants argue, however, that society does not recognize the expectation as reasonable.

/32442/2/60954v2
07/16/04-$PT/

The Defendants rely upon *U.S. v. Hambrick*, 55 F. Supp. 2d 504 (W.D. Va. 1999) for the proposition that Mr. Freedman did not have a reasonable expectation of privacy in his screen name and, therefore, that the warrant requirement of the Fourth Amendment was inapplicable in this case. However, the decision in *Hambrick* actually supports Mr. Freedman's Fourth Amendment claim. As the block quote on page 6 of the Defendants' memorandum of law states, the court in *Hambrick* rejected the Fourth Amendment claim, in part because

> there is nothing in the record to suggest that there was a restrictive agreement between the defendant and MindSpring (the ISP) that would limit the right of MindSpring to reveal the defendant's personal information to nongovernmental entities. Where such dissemination of information to nongovernmental entities is not prohibited, there can be no reasonable expectation of privacy in that information.

*Id.* at 509.

In this case, unlike in *Hambrick*, the agreement between Mr. Freedman and AOL seriously limited AOL's right to release his screen name to third parties. More importantly, AOL's privacy policy expressly states "We will not give out information that would link your screen names with your actual name." Exhibit L at 2, ¶ 1 (AOL Privacy Policy). AOL has only two exceptions to this rule: "We will release specific information about your account only to comply with valid legal process such as a search warrant, subpoena or court order, or in special cases such as a physical threat to you or others." *Id.* at 2, ¶ 5 (AOL Privacy Policy).

Given this policy, Mr. Freedman's expectation that AOL would not disclose his identity as GoMaryGoAway@aol.com was well justified and one that society would deem reasonable. Accordingly, the Fourth Amendment required the Defendants to use a valid search warrant to obtain his identity from AOL.

14

/32442/2/60954v2
07/16/04-SPT/

In resolving the Fourth Amendment issues that this case presents, the Court must also be mindful of the historic connection between the Fourth and First Amendments. "The struggle from which the Fourth Amendment emerged 'is largely a history of conflict between the Crown and the press." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (*citing Stanford v. Texas*, 379 U.S. 476, 482 (1965)). "It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eighteenth centuries. In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan. In later years warrants were sometimes more specific in content, but they typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel." *Stanford v. Texas*, 379 U.S. at 482.

In short, the First and Fourth Amendments (and the Fifth Amendment as well) "are indeed closely related, safeguarding not only privacy and protection against self-incrimination but 'conscience and human dignity and freedom of expression as well.'" *Id.* at 485. The courts have long recognized that the "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Id.* (*citing Marcus v. Search Warrant*, 367 U.S. 717, 729 (1961)). Thus, "where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Id.*

15

/32442/2/60954v2
07/16/04-SPT/

As the United States Supreme Court observed in *Reno v. ACLU*, 521 U.S. 844 (1997),
"[t]he Internet is a unique and wholly new medium of worldwide human communication."
[A]t any given time, tens of thousands of users are engaging in conversations on a huge range
of subjects." *Id.* at 852. In many ways the Internet is the 21ˢᵗ century version of the first
printing press; it constitutes a technological development that greatly increased the capacity of
individuals to communicate with each other. *Cf. id.* at 853. Consequently, the Court cannot
underestimate the threat to freedom of expression posed by unrestricted government searches
of Internet screen names. ***To the extent that any doubt exists as to whether society deems the
expectation of privacy in Internet screen names reasonable, that doubt must be resolved in
favor of privacy where the subject matter of the search is information protected by the First
Amendment.***

**B.    The Defendants' Are Not Entitled To Qualified Immunity For Their Fourth
Amendment Violation.**

To avail themselves of qualified immunity, the Defendants must demonstrate that it
would not have been clear to a reasonable officer that his conduct in the situation they
confronted was unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2002). Plainly, a reasonable
officer in the Defendants' situation would have known that it was unlawful to send an invalid
search warrant to AOL in order to obtain Mr. Freedman's subscriber information.[4] To the
extent that the issue is in doubt under the Fourth Amendment (which it is not), section 2703 of

---

[4] Although the qualified immunity test under 42 U.S.C. § 1983 is an objective one, *Harlow v.
Fitzgerald*, 457 U.S. 800, 815-19 (1982), it bears noting that everything about the Defendants'
conduct in this case demonstrates that they subjectively knew their conduct was unlawful.
First, Detective Young had prepared a written statement of the Police Department's policy
describing the procedure for obtaining subscriber information from an ISP. That policy
required the use of a valid search warrant. *See* Exhibit N (Sambrook Exhibit 1). Second,

16

the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701, et seq. removes any doubt that a valid warrant was required in this case. Accordingly, the Defendants are not entitled to summary judgment on their qualified immunity defense.

II.   **THE DEFENDANTS VIOLATED THE PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT BY ENGAGING IN A BAD FAITH "INVESTIGATION" AND BY FAILING TO SUBMIT THEIR WARRANT TO A JUDGE FOR APPROVAL.**

As noted, the Defendants claim that Mr. Freedman's e-mail message "constituted a threat and therefore falls outside of the protections of the First Amendment." Def. Mem. at 11. Accordingly, they contend that they are entitled to summary judgment on Mr. Freedman's First Amendment claim.

The fundamental flaw in this argument is that it rests upon a factual foundation that is disputed. A jury considering all of the evidence in this case could and should reasonably conclude that the defendants knew the "GoMaryGoAway" e-mail was a political satire commenting on the political candidacy and activities of Mary Carroll-Mirylees. Thus, the e-mail constituted core political speech that was entitled to maximum protection under the First Amendment. Given their knowledge of the nature of the e-mail, no compelling state interest justified the "investigation" and forced disclosure of Mr. Freedman's identity.

---

Detective Young had used search warrants in many previous cases to obtain subscriber information from AOL; this case represented the very first time that he did not present the warrant to a judge for approval. See Exhibit D at 18, 20-21 (Young transcript). This fact shows that Detective Young knew the law required a search warrant and that he deliberately evaded the law in this case, for the reasons describe above. Third, Sgt. Palazzolo testified that Detective Young needed a valid search warrant in this particular case. See Exhibit E at 27-28 (Palazzolo transcript). Although Detective Young offers contradictory testimony, a jury could reasonable conclude that Sgt. Palazzolo's testimony was truthful and the Detective Young was lying in an effort to shift blame for his actions to his superior officer.

/32442/2/60954v2
07/16/04-SPT/

Furthermore, the First Amendment does not permit the Defendants to decide for themselves whether certain speech warrants constitutional protection. As explained below, an individual – including a police officer – who wants to compel an Internet service provider ("ISP") such as AOL to disclose the identity of an anonymous Internet speaker, must use valid legal process that a court can scrutinize in advance of the disclosure. This procedure ensures that the government's need to learn the identity of the anonymous speaker outweighs the speaker's interest in engaging in constitutionally protected anonymous speech.

### A.     The First Amendment Protects Anonymous Speech on the Internet.

That the First Amendment protects *anonymous* (and pseudonymous) speech is well established.[5] *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 342 (1995). This fundamental constitutional right has deep historical roots. Indeed, the nation's founding fathers published great documents, such as the Federalist Papers, under pseudonyms. *Id.* at 346, n.6. "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *Id.* at 341 (*citing Talley v. California*, 362 U.S. 60, 64 (1960)). "Under our constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority, . . . It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation – and their ideas from suppression – at the hand of an intolerant society." *Id.* at 357.

The constitutional right to engage in anonymous and pseudonymous speech is not limited to traditional print media. As technology has advanced, the scope of this right has

---

[5] The Defendants concede that First Amendment protection for anonymous and pseudonymous speech is well established. Def. Mem. at 14.

/32442/2/60954v2
07/16/04-SPT/

advanced as well. Thus, it covers broadcast media and, of particular importance to this case,
the Internet. *E.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 885 (1997);
*American Civil Liberties Union v. Johnson*, 4 F.Supp.2d 1029, 1033 (D.N.M. 1998) (First
Amendment protects anonymous speech via the Internet); *American Civil Liberties Union of
Georgia v. Miller*, 977 F. Supp. 1228 (N.D.Ga. 1997) (holding that Georgia statute making it
a crime for internet user to send a message using a "false identity" violated the First
Amendment); *Doe v. 2TheMart.com*, 140 F.Supp.2d 1088, 1092 (W.D. Wash. 2001) ("The
right to speak anonymously extends to speech via the Internet").

Significantly, "when speech touches on matters of public political life, such as debate
over the qualifications of candidates, discussion of governmental or political affairs, discussion
of political campaigns, and advocacy of controversial points of view, such speech has been
described as the 'core' or 'essence' of the First Amendment. *Doe v. 2TheMart.Com*, 140
F.Supp.2d at 1092-93 (citing *McIntyre*, 514 U.S. at 346-47.) "Governmental restrictions on
such speech are entitled to 'exacting scrutiny,' and are upheld only where they are 'narrowly
tailored to serve an overriding state interest.'" *Id.*

In this case, the Defendants violated the First Amendment because no "overriding state
interest" justified the compelled disclosure of Mr. Freedman's identity. Although the
Defendants characterize the e-mail as a "threat" that is not subject to First Amendment
protection and that they had a compelling interest to investigate, the law and the evidence belie
that characterization.

As the Defendants acknowledge, whether a writing constitutes a threat depends, in part,
on whether the recipient of the writing is familiar with the context of the writing. Def. Mem.

/32442/2/60954v2
07/16/04-SPT/

at 12 (citing *U.S. v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994)).  Here, the facts show that the

Defendants were entirely familiar with the "context" of Mr. Freedman's e-mail.  The two

highest ranking members of the Fairfield Police Department – Chief Sambrook and Captain

Dyer – immediately recognized the e-mail for what it was – political satire.  *See* Exhibit F at

16, 18 (Dyer transcript); *See* Exhibit G at 18 (Sambrook transcript).

     Moreover, a jury could reasonably conclude that the Defendants sought the disclosure

of Mr. Freedman's identity from AOL because they wanted to help Ms. Carroll-Mirylees – a

Fairfield Police Commissioner with oversight authority for the Fairfield Police Department –

identify an individual who appeared to be challenging her *politically*.

     In short, the Defendants understood the historical and political context of the e-mail,

knew it was *not* a threat, and compelled AOL to disclose Mr. Freedman's identity, not

pursuant to a legitimate, good faith law enforcement investigation, but as a favor to Ms.

Carroll-Mirylees.  Such conduct by a state actor, particularly a law enforcement officer,

violates the First Amendment on the facts of this case.  *Cf. Branzburg v. Hayes*, 408 U.S. 665,

707 (1972) (bad faith law enforcement investigations and harassment of members of the press

violates First Amendment); *Reporters Com. v. American Tel. & Tel*, 593 F.2d 1030, 1064

(D.C. Cir. 1978) (bad faith use of subpoenas and investigative techniques by law enforcement

"may constitute an abridgement of the First Amendment rights of the citizens at whom they are

directed. . . .")

/32442/2/60954v2
07/16/04-SPT/

**B.**   **The First Amendment Requires Courts To Screen Government Requests To Compel A Third-Party To Disclose The Identity Of An Anonymous Internet Speaker.**

In addition to its substantive limitations on the government's ability to infringe on anonymous speech, the First Amendment also imposes *procedural* limitations on government efforts to compel the disclosure of the identity of an anonymous speaker. Particularly in the context of anonymous speech via the Internet, the law requires a party seeking to compel an ISP to disclose the identity of a user to demonstrate that the existence of a legitimate, good faith basis for obtaining that constitutionally significant information. The Defendants' evasion of this procedure constitutes an independent violation of the First Amendment.[6]

Several cases involving the procedural First Amendment right at issue in this case warrant brief discussion: *Columbia Ins. Co. v. Seascandy.Com*, 185 F.R.D. 573 (N.D. Cal. 1999); *Dendrite Int'l, Inc. v. Doe*, 342 N.J.Super. 134, 775 A.2d 756 (2001); and *In re Subpoena Duces Tecum to America Online, Inc.*, 2000 WL 1210372, *1 (Va. Cir. Ct. Jan. 31, 2000). (A copy of the decision in *In re Subpoena* is attached hereto as Exhibit M.)

In *Seascandy.Com*, the seminal case, the plaintiff filed a complaint against several unknown defendants, who were identified only by their internet domain names. The complaint alleged that the defendants had infringed the plaintiff's federally registered trademarks by using domain names virtually identical to ones that the plaintiff owned. Because the plaintiff did not know the actual identity of the defendants, it could not serve a complaint on them. Accordingly, it sought pre-service discovery to ascertain their true identities.

---

[6] The notion that the First Amendment imposes procedural, as well as substantive, limits on the government's authority to regulate and/or punish speech is hardly novel. *See Waters v. Churchill*, 511 U.S. 661, 664 (1994) (describing procedural requirements under the First Amendment).

21

Recognizing the important First Amendment interests that such discovery implicated, the court ruled that four limiting principles would apply to such discovery:

1)  A plaintiff must identify the missing party with sufficient specificity such that the court can determine that the defendant is a real person or entity who could be sued in federal court;

2)  A plaintiff must identify all previous steps taken to locate the actual defendants to demonstrate that it has made a good faith effort to comply with the requirements of service of process;

3)  *The plaintiff must establish to the court's satisfaction that the lawsuit could withstand a motion to dismiss*; and

4)  The plaintiff should file a request for discovery with the court, accompanied by a statement of reasons justifying the specific discovery and identifying the limited number of persons upon whom it would be served.

*Id.* at 578-80 (emphasis supplied). *See also Dendrite Int'l, Inc. v. Doe*, 342 N.J.Super. 134, 775 A.2d 756, 767-68 (2001) (describing *Seescandy.Com* four-pronged analysis); *2TheMart.Com*, 140 F. Supp.2d at 1094 (same).

For the purposes of this case, the third requirement – that the plaintiff must establish to a court's satisfaction that the lawsuit could withstand a motion to dismiss – is the most important. Notably, the court in *Seescandy.com* compared this requirement to the process of obtaining a search warrant in a criminal case – *the same process that the Defendants in this case intentionally evaded:*

Pre-service discovery is akin to the process used during criminal investigations to obtain warrants. The requirement that the government show probable cause is, in part, a protection against the misuse of *ex parte* procedures to invade the privacy of one who has done no wrong.

185 F.R.D. at 579.

22

/32442/2/609954v2
07/16/04-SPT/

In another important case, *Dendrite Int'l v. Doe, supra,* the appellate court denied the plaintiff's discovery request to compel an ISP to disclose the names of the John Doe defendants, whom the plaintiff had sued for on-line defamation. In so doing, the court relied on the third principle articulated in *Seescandy.Com.* The court observed that the traditional legal standards applicable to a motion to dismiss were *not* sufficiently rigorous to satisfy the First Amendment interests in the case. Rather, a heightened level of scrutiny was required. Applying such scrutiny, the appellate court agreed with the trial court that discovery of the defendants' identities should *not* be permitted because the plaintiff had failed to demonstrate that the allegedly defamatory statements had caused it harm. Thus, the plaintiff had failed to demonstrate that the alleged defamation was actionable. 342 N.J. Super. at 58, 775 A.2d at 772.

In so holding, the appellate court also relied upon *In re Subpoena Duces Tecum to America Online, Inc. Id.,* 342 N.J. Super. at 156-57, 775 A.2d at 771. There, the court also applied a rigorous level of scrutiny to a corporate plaintiff's request to compel America Online, Inc. to disclose the identity of John Doe defendants who published allegedly confidential insider information and defamatory statements about the plaintiff in Internet chat rooms. "Before a court abridges the First Amendment right of a person to communicate anonymously on the Internet, a showing, sufficient to enable that court to determine that a true, rather than a perceived, cause of action may exist, must be made." *In re Subpoena,* 2000 WL 1210372, at *7. The court held that, in such a case, the party requesting the subpoena must satisfy the court that it has a *legitimate, good faith basis* to contend that it may be the victim of actionable conduct. *Id.* at *8.

23

These precedents establish that the First Amendment imposes additional *procedural* safeguards, beyond those generally associated with the civil litigation discovery process, when the identity of an anonymous speaker is at issue. These procedural safeguards, however, are not limited to civil litigation, but apply in the criminal context as well. *E.g., Reporters Comm. v. American Tel. & Tel.*, 593 F.2d 1030, 1079-97 (D.C. Cir. 1978) (Wright, J. *dissenting*) (arguing that the First Amendment requires prior judicial screening of law enforcement requests for telephone toll records in order to protect First Amendment interests). *See also Zurcher*, 436 U.S. at 564 (where search warrant is used to seize materials or information that may be protected by the First Amendment, court must apply Fourth Amendment warrant requirements with "scrupulous exactitude") (*citing Stanford v. Texas*, 379 U.S. at 485). The First Amendment requirement that a judge carefully scrutinize a police officer's request to search for protected materials, such as the identity of an anonymous speaker, plainly implies the existence of a corollary requirement, *viz.*, that the police officer must use valid legal process to obtain that information. Otherwise, there would be nothing for the court to scrutinize.

Accordingly, when the record evidence is viewed in light of the above precedents, it is readily apparent that the Defendants' motion for summary judgment on Mr. Freedman's First Amendment claim must be denied. The Defendants' failure to use valid legal process (*e.g.*, a search warrant, subpoena or court order) constituted an "end run" around the procedural requirements that the First Amendment imposes on a party's effort to compel a non-party (such as AOL) to disclose the identity of an anonymous speaker. By evading those procedural requirements, the Defendants violated the First Amendment, regardless of whether they were

24

engaged in a good faith investigation of an e-mail that they believed constituted a "threat."

*Reporters Comm. v. American Tel. & Tel.*, 593 F.2d at 1079-97 (Wright, J. *dissenting*); *cf.*

*Waters v. Churchill*, 511 U.S. at 669 (observing that "government action based on protected

speech may, under some circumstances, violate the First Amendment even if the government

actor honestly believes the speech is unprotected.)

### C. The Defendants Are Not Entitled To Qualified Immunity For Their First Amendment Violations.

The Defendants concede that "it is well established that the First Amendment protects

anonymous and pseudonym [sic] speech . . . ." Def. Mem. at 14. This concession satisfies

the principle requirement of qualified immunity, *viz.*, that the constitutional right in question

must be clearly established. *Smith v. City of New Haven*, 166 F.Supp.2d 636, 641 (*citing*

*Harlow v. Fitzgerald*, 467 U.S. 800, 818 (1981)). The only question, then, is whether the

Defendants reasonably understood that their conduct was unlawful. *Rodriguez v. Phillips*, 66

F.3d 470, 476 (*citing Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)). The Court

should answer that question "no." At a minimum, the facts relevant to deciding that question

are disputed.

More specifically, the Defendants contend that they are entitled to qualified immunity

because they "had an obligation to investigate the complaints filed by Mulligan and Brandt"

and because "potential threats" do not enjoy constitutional protection. Def. Mem. at 14. The

Defendants, however, cite no legal authority for the proposition that they were legally required

to investigate an e-mail *that they knew was a political satire or joke*. Moreover, as noted, a

jury could reasonably conclude that the Defendants did not contact AOL pursuant to a lawful

investigation, but instead were helping Ms. Carroll-Mirylees, a Fairfield Police Commissioner,

25

/32442/2/60954v2
07/16/04-SPT/