learn the identity of an apparent political challenger. One cannot overemphasize the importance of the evidence that Detective Young had sent search warrants to AOL on numerous occasions, *but this case represented the very first time that he failed to submit the warrant to a judge for review and approval.* The juxtaposition of that fact with the rest of the evidence compels the conclusion – and would at least permit a jury reasonably to conclude – that the Defendants knowingly misused the powers of their offices to do a favor for an important political person with oversight responsibility for the Fairfield Police Department.

Given these probable facts and the clearly established nature of the First Amendment rights at issue, the Defendants cannot sustain their burden of proving that they reasonably believed their conduct was lawful. At a minimum, the facts essential to establishing a qualified immunity defense are disputed. Consequently, the Defendants are not entitled to summary judgment on the First Amendment claim based on qualified immunity.

### III. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S CLAIM UNDER ARTICLE FIRST, SECTION FOUR OF THE CONNECTICUT CONSTITUTION.

In moving for summary judgment on Mr. Freedman's claim under article first, § 4 of the Connecticut Constitution (the state counterpart to the First Amendment), the Defendants simply repeat their argument that Mr. Freedman's e-mail constituted a "threat," which is beyond constitutional protection. Def. Mem. at 16. That argument should be rejected for the reasons set forth in Part II, *supra*. Specifically, the evidence shows that the Defendants knew the e-mail was not a threat, but was instead a political satire. Thus, it was protected speech and the Defendants lacked a compelling state interest to justify compelling AOL to disclose Mr. Freedman's identity.

26

/32442/2/60954v2
07/16/04-SPT/

In addition, the Defendants are not entitled summary judgment on this claim based upon immunity. They contend that their conduct does not fall within any of the exceptions to government immunity, as described in the case of *Shore v. Stonington*, 187 Conn. 147, 444 A. 2d. 1379 (1982). Def. Mem. at 18. *This argument is flawed because the Defendants have invoked the wrong immunity doctrine.* The common law doctrine of government immunity applies to common law claims, not to constitutional violations. *Cf. Mulligan v. Rioux*, 229 Conn. 716, 727-729, 643 A. 2d 1226 (1994) (holding that trial court erred by applying common law immunity standard to constitutional violation under section 1983).

Plaintiff's counsel have been unable to locate any case law reflecting that Connecticut has formally adopted a form of qualified immunity for violations of its state constitution. At best, the case law intimates that a public official would be entitled to qualified immunity for state constitutional violations "for official actions taken reasonably *and in good faith.*" *Binette v. Sabo*, 224 Conn. 23, 50 n.23, 615 A. 2d 1040 (1998) (emphasis supplied). Under such a standard, the Defendants plainly would not be entitled to immunity, for their conduct smacks of bad faith.

However, even assuming that the Connecticut Supreme Court would follow the qualified immunity precedents applicable to federal constitutional claims under section 1983, the Defendants would not be entitled to immunity for the reasons set forth in Part II(c) above.

## IV. THE DEFENDANTS VIOLATED ARTICLE FIRST, SECTION SEVEN OF THE CONNECTICUT CONSTITUTION.

In *Binette v. Sabo*, 244 Conn. 23, 615 A. 2d 1040 (1998), the Connecticut Supreme Court expressly recognized a private right of action for damages based upon violation of article

27

first, § 7 of the Connecticut Constitution.[7] While the Fourth Amendment establishes minimum standards for individual rights, the Connecticut Supreme Court has recognized that article first, § 7 affords considerably broader protection for individual rights in certain circumstances. *E.g., State v. Marsala*, 216 Conn. 150, 579 A. 2d 58 (1990) (holding that article first, § 7 does not contain a "good faith" exception to exclusionary rule).

To determine whether an individual's expectation of privacy is one that warrants protection under article first, § 7, the Connecticut Supreme Court has stated that "the reasonable expectation of privacy analysis is peculiarly focused on current conditions and requires a factual inquiry into all the relevant circumstances of the search." *State v. Defusco*, 224 Conn. 627, 635, 620 A. 2d 746 (1993). The question is "what Connecticut citizens would consider reasonable in the present day." *Id.*

The answer, counsel submits, is that Connecticut citizens would consider Mr. Freedman's expectation of privacy in his AOL screen name reasonable. As previously explained, when Mr. Freedman signed up with AOL, created the "GoMaryGoAway" screen name and used that screen name to send the e-mail at issue in this case, he assumed virtually no risk whatsoever that AOL would disclose to any third party that he sent the e-mail.

Notably, other states courts have recognized that their state constitutions protect an individual's privacy in certain types of information that the individual may give to a third party. For example, in *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 529 P.2d 590 (1974), which interpreted a party's privacy rights under the California state

---

[7] Article first, § 7 provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

28

/32442/2/60954v2
07/16/04-SPT/

constitution, the California Supreme Court held that the customer of a bank had a reasonable expectation of privacy in his bank records. Thus, the bank could not validly consent to a government actor's request to search the customer's records. Instead, a warrant was required. Other state courts have followed the lead of the *Burrows* court. *E.g., Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d. 1117 (1980); *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979). Moreover, the holding in *Burrows* has been extended to include credits cards and telephone records. *People v. Blair*, 25 Cal.3d 640, 602 P.2d 738, 159 Cal.Rptr. 818 (1979); *People v. Mejia*, 95 Cal.App.3d 828, 157 Cal.Rptr. 233 (1979).

While these cases do not necessarily forecast how the Connecticut Supreme Court would decide the issue in this case, they exemplify the willingness of state courts to hold that an individual does not sacrifice his privacy interest in certain types of information just because he has shared that information with another party, such as a bank, telephone company or credit care company. Likewise, the Court should hold that when an individual, like Mr. Freedman, opens up an account with AOL and creates a screen name, his expectation that his true identity will not be disclosed is one that Connecticut citizens would consider reasonable.

For the foregoing reasons, the Defendants are not entitled to summary judgment on the claim that they violated article first, § 7.[8]

## V.   THE DEFENDANTS SEEK SUMMARY JUDGMENT ON AN INVASION OF PRIVACY CLAIM THAT THE PLAINTIFF HAS NOT PLED.

The Defendants have moved for summary judgment on Mr. Freedman's invasion of privacy claim (Count Eight of the Complaint) based upon a theory of invasion of privacy that

---

[8] The Defendants have not moved for summary judgment on Mr. Freedman's article first, § 7 claim on the alternative ground of immunity. Accordingly, the Defendants do not address that issue in this memorandum.

29

he did not plead in his complaint. As the Defendants acknowledge (Def. Mem. at 22), the invasion of privacy tort is really four distinct torts, all of which are recognized in Connecticut. In paragraph 64 of his Complaint, Mr. Freedman alleged that the Defendants' conduct "constituted an intentional intrusion upon Freedman's seclusion, his private affairs and/or concerns and such intrusion was highly offensive to a reasonable person." Thus, Mr. Freedman pled the "intrusion upon seclusion" tort. This tort is codified in the Restatement (Second) of Torts, § 652B [hereinafter "Restatement"]. The intrusion into Mr. Freedman's privacy subjects the defendants to liability, even in the absence of the publication or disclosure of the information they acquired. Restatement § 652B, cmt. b.

Defendants, however, take the position in their motion that Mr. Freedman had alleged a claim for invasion of privacy based on the *disclosure* of private facts. This tort is codified in section 652D of the Restatement. Thus, the Defendants' arguments as to why they are entitled to summary judgment on Count Eight are directed to a theory of liability that Mr. Freedman has not pled.[9]

Had the Defendants moved for summary judgment on Mr. Freedman's intrusion claim, however, the motion would still have been without merit. Whether an intrusion is "highly offensive to a reasonable person" is a question of fact to be left to jury. *E.g., Flowers v. New Britain Gen. Hospital*, 9 CSCR 699 (June 10, 1994) (denying motion for summary judgment because question of whether defendant's conduct was highly offensive was for the jury).

---

[9] Mr. Freedman also alleged that the subsequent disclosure of the information that the defendants obtain by "intruding upon his seclusion" led to adverse publicity. *See* Complaint at ¶ 64. But that disclosure constitutes an element of damages for the intrusion tort, not liability. Mr. Freedman has not alleged that the disclosure itself constitutes an actionable tort under section 652D of the Restatement.

30

## VI. FACTUAL DISPUTES REGARDING THE FAIRFIELD POLICE DEPARTMENT'S POLICIES CONCERNING SEARCH AND SEARCH WARRANTS PRECLUDE SUMMARY JUDGMENT ON THE PLAINTIFF'S RESPONDEAT SUPERIOR CLAIM.

The Town also moves for summary judgment on Count XI of the Complaint, which alleges that the Town is liable for the unlawful conduct of detectives Young and Bensey on the theory that they acted pursuant to an unconstitutional Town policy. The Defendants contend that "there is no genuine issue of material fact in dispute" that the "Fairfield Police did not have a policy that directed its officers to submit search and seizure warrants that were not signed by a judge to ISPs". Def. Mem. at 28. The evidence belies this statement.

According to Chief Sambrook and Captain Dyer, the department's policy permitted officers to send unsigned search warrants to ISPs. That policy was based on their belief that AOL permitted law enforcement officials to submit unsigned search warrants when seeking subscriber information:

> Q   Is it your understanding that what Capt. Dyer was telling you is the AOL would accept a Connecticut search warrant that did not bear a judge's signature?
>
> A.  Yes, sir.
>
> Q   Did he tell you where he -- how it is he came to have that belief?
>
> A   If memory serves me, I believe he said that *that's the procedure that AOL had always used* and that *it had been questioned in the past and that it was never challenged* and that that's the way they operate and it was acceptable.

See Exhibit G at 26-27 (Sambrook transcript) (emphasis added). These two individuals are the highest ranking members of the Fairfield Police Department and, therefore, constitute final decisionmakers or policymakers for the purpose of establishing the Town's liability under

31

/32442/2/60954v2
07/16/04-SPT/

section 1983.[10] Moreover, as Det. Young testified, his supervisor, Sgt. Palazzolo, *told him that sending the unsigned warrant was the proper procedure.* *See* Exhibit D at 12 (Young transcript).

Furthermore, any claim that this was a single isolated incident as opposed to a policy by the Fairfield police is trounced by Det. Young's testimony asserting that he faxed AOL an unsigned search warrant application for subscriber information in an unrelated investigation subsequent to the e-mail at issue in this lawsuit. *See* Exhibit D at 19-20 (Young transcript). Therefore, at the very least, a jury could reasonably conclude that this procedure was the policy of the Fairfield police during these two incidents. Indeed, what constitutes a policy "need not be contained in an explicitly adopted rule or regulation." *Sorlucco v. New York City*

---

[10] *E.g.*, *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (Town's police chief had final policymaking authority with respect to actions of the police force); *Chortek v. City of Milwaukee*, 356 F.3d 740, 749 (7th Cir. 2004) (finding that police chief was charged with the command and rule-making responsibilities for the police department); *Columbia v. Sabo*, 1994 Conn. Super. LEXIS 305, *8-9 (February 2, 1994) (holding that "[i]t is undisputed that the police chief has general authority to supervise police officers" and finding that a police chief could be a policymaker on behalf of a city).

 The testimony of both Chief Sambrook and Fairfield Police Commissioner Mary Carroll-Mirylees confirm the status of the former as the final policymaker on the search warrant policies at issue in this case:

> Q   Could you describe, again generally, what your responsibilities are as chief of police?
> A   The overall management of the police department.

*See* Exhibit G at 8 (Sambrook transcript).

> Q   Would you please describe the responsibilities of the police commission generally? What powers does it have under Fairfield ordinances?
> A   The police commission has no direct day-to-day operational responsibilities.

*See* Exhibit B at 10 (Carroll-Mirylees transcript).

32

/32442/2/60954v2
07/16/04-SPT/

*Police Department*, 971 F.2d 864, 870 (2d Cir. 1992). Moreover, even a single incident can impute liability onto a municipality. *See Amnesty America v. Waugh*, 361 F.3d 113, 126-27 (2d. Cir. 2004) (stating the principle that a municipality may be liable for a subordinate's actions for a single incident when they are effectively ratified by a policy maker).

For the foregoing reasons, the Defendants' request for summary judgment on Count XI should be denied.

### VII. THE TOWN FAILED TO PROMULGATE AND ENFORCE PROPER GUIDELINES, AND ADEQUATELY TRAIN ITS OFFICERS ON THE PROPER METHODS OF EXECUTING A SEARCH AND SEIZURE WARRANT.

Finally, the Town contends that is entitled to summary judgment as to Count IX of Mr. Freedman's Complaint. As a preliminary matter, the Town restricts its argument for summary judgment on Count IX to Mr. Freedman's allegations concerning the lack of proper training. However, Mr. Freedman has also asserted in Count IX that the Town failed "to promulgate and enforce appropriate guidelines. . . ." (*See* Complaint at ¶70). The Defendants have utterly failed to address that allegation. For that reason alone, the motion should be denied on that count.

Furthermore, on the issue of lack of training, the Defendants again state that "there is no genuine issue of material fact in dispute that the Fairfield Police Department trained its officers on the proper methods of executing a search and seizure warrant". Def. Mem. at 22. This statement is incorrect.

At the outset, the Town attacks the wrong argument. The issue that Mr. Freedman's Complaint raises is not whether the Town failed to properly train its police officers in general, but whether it failed to train them properly in connection with the legal requirements for

33

obtaining subscriber information from ISP's. On that narrow issue, the deposition testimony of members of the Fairfield Police Department reveals conflicting statements.

As noted, Detective Young testified that his supervisor, Sgt. Palazzolo, told him that sending an unsigned warrant application to AOL was sufficient. *See* Exhibit D at 12 (Young transcript). However, Det. Young had prepared a document on how to obtain information from AOL, setting forth that a signed warrant was required. *See* Exhibit N (Sambrook Exhibit 1). Further adding to the confusion, Sgt. Palazzolo stated that the proper procedure was sending the warrant application to Loudoun County for transcription to a local warrant, which would then be submitted to a local magistrate. *See* Exhibit E at 27-28 (Palazzolo transcript). Nevertheless, Capt. Dyer testified that it was his understanding through Det. Bensey that unsigned affidavits were sufficient. *See* Exhibit F at 24 (Dyer transcript). Chief Sambrook also confirmed this. *See* Exhibit G at 26-27 (Sambrook transcript).

In an apparent effort to counter this conflicting evidence, the Defendants annex to their summary judgment motion numerous documents showing Detectives Young and Bensey's attendance and graduation from the Connecticut Police Academy, and their re-certifications. *See* Def. Mem. at 26 and "Exhibit 1" annexed thereto. While these documents may show that these detectives have done what was minimally required of them to serve and continue to serve as police officers, they do not show that the detectives were adequately trained in any of the specific areas at issue in this case, *i.e.* preparing and submitting warrants to an Internet service provider.

The annexed documents that refer to Det. Young show that he attended only three courses that are even remotely related to these issues: "Warrant Preparation" on September

34

/32442/2/60954v2
07/16/04-SPT/

16, 1992; and "Search and Seizure" on December 4, 1991 and May 27, 1986. *See* Exhibit A annexed to "Exhibit 1" of Def. Mem. However, the latest course was completed almost eleven (11) years before the incident in this case. With the advent of internet use and relevant law only occurring within the past decade or so, these courses could not have even touched upon the issues in this case. Moreover, the only course that Det. Young actually attended on "Internet Investigation Techniques" was completed on March 22, 2004, almost a year *after* this incident. *Id.* Indeed, if Det. Young was given this training *before* he was assigned to investigate this matter, Mr. Freedman's rights may have not been violated as they now are.

The very few documents that refer to Det. Bensey also fail to prove that he was properly trained in this area. They show that Det. Bensey only attended two (2) courses that may be relevant to these issues: "Warrant Preparation" on December 3, 1986 and "Search/Seizure/Warrant" on March 15, 1988. However, the latest course was completed almost fifteen (15) years before the incident. *Id.* Again, these courses could not have provided Det. Bensey with the requisite training for this matter.

Based on the Defendants' testimony and their documentary evidence, a jury could reasonably conclude that the Town failed to properly train these detectives. At the bare minimum, they show that substantial factual disputes exist in this area. Accordingly, the Defendants' request for summary judgment as to Count IX must be denied.

## CONCLUSION

The evidence is overwhelming that the Defendants engaged in a bad faith investigation in which they sought to learn the identity of "GoMaryGoAway@aol.com" for the purpose of assisting Mary Carroll-Mirylees, a Fairfield Police Commissioner, in her quest to become First

35

Selectman. Given their knowledge of the political context and meaning of Mr. Freedman's e-mail, and knowing that they would have to disclose that knowledge to a judge if they submitted the search warrant for approval, they made a conscious decision to by-pass that constitutionally mandated procedure. Instead, they sent an unsigned search warrant to AOL, hoping that AOL would miss the patent defect in the warrant. That gamble was successful, but the impact on Mr. Freedman of the disclosure of his subscriber information has been devastating.

For these reasons, as explained in detail above, the Defendants' motion for partial summary judgment should be denied.

THE PLAINTIFF,

CLIFTON S. FREEDMAN

By: _____
Daniel J. Klau (ct17957)
H. James Pickerstein (ct05094)
Calvin K. Woo (ct24951)
Pepe & Hazard LLP
Goodwin Square
225 Asylum Street
Hartford, CT 06103-4302
Phone: (860) 522-5175
Fax: (860) 522-2796
dklau@pepehazard.com
hpickerstein@pepehazard.com
cwoo@pepehazard.com

Robert Y. Altchiler (ct24247)
The Law Offices of Robert Y. Altchiler
191 Post Road West
Westport, CT 06880

36

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent by federal express, postage prepaid, this 16 day of July, 2004 to the following:

Thomas Murtha, Esq.
Mark Perkins, Esq.
Maher & Murtha, LLC
528 Clinton Avenue
P.O. Box 901
Bridgeport, CT 06601

_____
Calvin K. Woo

/32442/2/60954v2
09/15/04-SPT/