# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Clifton S. FREEDMAN, | : | |
| Plaintiff, | : | |
| | : | |
| -vs- | : | Civil No. 3:03cv1048  (PCD) |
| | : | |
| AMERICA ONLINE, INC., | : | |
| et al. | : | |
| Defendants. | : | |

## RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.     Introduction**

Defendants, Town of Fairfield, William Young, and David Bensey move [Doc. No. 61], pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment as to Counts Four, Five, Six, Seven, Eight, Nine, and Eleven of Plaintiff's Complaint.  For the reasons that follow, Defendants' Motion is **granted in part** and **denied in part**.

**II.    Background**

In September 2001, Mary Carol-Mirylees ("Carol-Mirylees") ran against incumbent John Metsopoulous ("Metsopoulous") in the 2001 Republican primary for the position of First Selectman in the town of Fairfield, Connecticut.  (Pls.' Opp. Defs.' Mot. Partial Summ. J. at 2.) Carol-Mirylees' campaign used the phrase "Run Mary Run," and bumper stickers containing the phrase were circulated during the summer of 2001.  (Id.)  After losing the primary, Carol-Mirylees and some of her campaign supporters, including Sandy Mulligan and her campaign manager, Glendine Brandt, assisted the local Democratic party in its efforts to elect Ken Flatto, a Democrat, and not Metsopoulous, during the general election campaign for First Selectman in

November 2001.  (Id.)

During the 2001 general election, the campaign against Metsopoulous circulated bumper stickers and other political paraphernalia bearing the slogans "Go John Go Away, Your Days Are Numbered" and "Anybody But John."  (Id.)  On at least one occasion, an airplane, trailing a banner that read "Go John Go Away," flew over the town of Fairfield.  (Id.)  In addition, a website address of anythingbutjohn.com was created.  (Id.)  Local newspapers, including the Fairfield Citizen and the Bridgeport Post, published reports about the campaign.  (Id.)

Plaintiff, Clifton Freedman, was an active member of the Fairfield Republican Party and a member of the Fairfield Republican Town Committee from 1999 to 2003.  (Id. at 4.)  Plaintiff also supported incumbent Metsopoulous.  (Id.)  On March 31, 2003, Plaintiff, using the screen name GoMaryGoAway, sent an email, stating that "The End is Near," to Sandra Mulligan ("Mulligan") and Dee Dee Brandt ("Brandt").  (Defs' Mem. Support Mot. Summ. J. at 1-2.) Plaintiff's identity was not discernable from the email.

After receiving the email, Brandt or Mulligan informed Carol-Mirylees, who had been a Fairfield Police Commissioner since 2001. (Id. at 5.)  Carol-Mirylees then called Joseph Sambrook, Chief of Police of the Fairfield Police Department, and explained that "some friends of hers had received an email which they felt [was] threatening."  (Id.)  In response, Sambrook advised Carol-Mirylees that Brandt and Mulligan should file an incident report.

On March 31, 2003, Mulligan filed with the Fairfield Police Department a complaint based upon her receipt of Plaintiff's email.  (Id. at 2.)  On April 1, 2003, Mulligan and Brandt, after meeting with Detective William Young ("Young"), signed an Internet/Computer Harassment Statement Form, alleging that they had received a harassing and/or obscene email

message.  (Id.)  Young then completed, and Officer David Bensey ("Bensey") signed as co-affiant, an Affidavit and Connecticut Superior Court Application for Search and Seizure Warrant ("the Application"), detailing the facts presented by Mulligan and Brandt.  (Id.) Without submitting the Application to the Connecticut State Attorney's office or to a Judge, Young faxed a copy of it to AOL's legal department.  (Id.)  On April 7, 2003, AOL responded to the Application by faxing Plaintiff's subscriber information to Young.  (Id. at 3.)  This information included Plaintiff's name, address, phone numbers, account status, membership information, software information, billing and account information, and his other AOL screen names.  (Id.) Based upon the information that Sheridan had provided, Young advised Mulligan and Brandt that Plaintiff had sent the email.  (Id.)  Young thereafter met Plaintiff at his residence, at which time Plaintiff admitted that he had sent the email, but stated that he had sent it as a harmless joke to his political colleagues.  (Id.)  No charges were filed against Plaintiff.  On June 12, 2003, Plaintiff filed the present action against Young, Bensey, the Town of Fairfield, and AOL.[1]  (Id.)

## III.    Standard of Review

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue

---

[1]In a previous ruling, the Court ordered that the claims against AOL shall be transferred to the United States District Court for the Eastern District of Virginia. See Freedman v. Am. Online, Inc., 2004 U.S. Dist. LEXIS 1388 at *2 (Jan. 30, 2004).

3

for trial.'" <u>Amnesty Am. v. Town of W. Hartford</u>, 288 F.3d 467, 470 (2d Cir. 2002) (quoting

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In

determining whether a genuine issue has been raised, all ambiguities are resolved and all

reasonable inferences are drawn against the moving party. <u>United States v. Diebold, Inc.</u>, 369

U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); <u>Quinn v. Syracuse Model Neighborhood</u>

<u>Corp.</u>, 613 F.2d 438, 445 (2d Cir. 1980). Summary judgment is proper when reasonable minds

could not differ as to the import of evidence. <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir.

1991). "Conclusory allegations will not suffice to create a genuine issue." <u>Delaware & H.R. Co.</u>

<u>v. Conrail</u>, 902 F.2d 174, 178 (2d Cir. 1990). Determinations as to the weight to accord evidence

or credibility assessments of witnesses are improper on a motion for summary judgment as such

are within the sole province of the jury. <u>Hayes v. N.Y. City Dep't of Corr.</u>, 84 F.3d 614, 619 (2d

Cir. 1996).

## III.    Discussion

Defendants move for partial summary judgment as to Counts Four, Five, Six, Seven,

Eight, Nine, and Eleven of Plaintiff's Complaint. Defendants argue that summary judgment

should be granted with respect to: Count Four because Plaintiff did not have an objectively

reasonable expectation of privacy in his subscriber information and, thus, they could not have

violated his Fourth Amendment rights; Counts Five and Six because Plaintiff's right to free

speech under the First Amendment to the United States Constitution and article first, § 4 to

Constitution of Connecticut do not preempt Defendants' compelling interest in investigating a

potential threat of physical harm to several of its residents; Count Seven because Plaintiff did not

have an objectively reasonable expectation of privacy in his subscriber information for purposes

4

of article first, § 7 of the Constitution of Connecticut; Count Eight because the information that

Defendants obtained and recorded in the police report was of legitimate public concern and, thus,

they could not have invaded Plaintiff's privacy; Count Nine because there is no evidence to

support Plaintiff's claim that the Town failed to train its officers and was deliberately indifferent

to the rights of the residents and visitors to the Town; and Count Eleven because there is no

genuine issue of material fact in dispute as to the fact that the Town did not have a policy that

directed its officers to submit search and seizure warrant applications to internet service

providers without first obtaining a judge's signature.  These arguments are addressed in turn.

### A.    Fourth Amendment

Defendants move for summary judgment on Count Four of Plaintiff's complaint on the

grounds that Plaintiff did not have a reasonable expectation of privacy in his subscriber

information and, thus, they could not have violated his Fourth Amendment rights.  Plaintiff

counters that Defendants violated his Fourth Amendment rights because they were required to

obtain a valid search warrant prior to obtaining his identity from AOL because he reasonably

believed that AOL would not disclose his identity.

A two-part test is utilized to determine whether an intrusion into an individual's privacy

violated the Fourth Amendment.  A court must examine whether the individual has established a

subjective expectation of privacy and, if so, whether society would recognize this expectation as

objectively reasonable.  Florida v. Riley, 488 U.S. 445, 449, 109 S. Ct. 693, 102 L. Ed. 2d 835

(1989).  Both criteria must be satisfied to implicate a privacy interest protected by the Fourth

Amendment.  Only a few cases have considered whether, for purposes of the Fourth Amendment,

society would consider reasonable an internet subscriber's expectation in non-content

information provided to an ISP to receive internet service.  See, e.g., United States v. Hambrick, 55 F. Supp. 2d 504 (W.D. Va. 1999), aff'd 225 F.3d 656 (4th Cir. 2000), cert. denied, 531 U.S. 1099, 121 S. Ct. 832, 148 L. Ed. 2d 714 (2001); United States v. Kennedy, 81 F. Supp. 2d 1103 (D. Kan. 2000).

In the cases in which the issue has been considered, courts have universally found that, for purposes of the Fourth Amendment, a subscriber does not maintain a reasonable expectation of privacy with respect to his subscriber information.  In reaching this conclusion, courts have emphasized: (1)  the distinction between the content of electronic communications, which is protected, and non-content information, including a subscriber's screen name and corresponding identity, which is not; (2) the language of the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. 2701 et seq., which expressly permits ISPs to disclose subscriber information to non-governmental third parties and also to the government, under more restrictive conditions; and (3) the agreement between the subscriber and the ISP to assess whether a subscriber's subjective expectation of privacy in his non-content subscriber information was one that society would be willing to accept as objectively reasonable.

The case first addressing the issue was United States v. Hambrick, 55 F. Supp. 2d 504 (W.D. Va. 1999), aff'd 225 F.3d 656 (4th Cir. 2000), cert. denied, 531 U.S. 1099, 121 S. Ct. 832, 148 L. Ed. 2d 714 (2001).  In Hambrick, the government served a subpoena on MindSpring, defendant's internet service provider, requesting "any records pertaining to the billing and/or user records documenting the subject using your services on March 14th, 1998 at 1210 HRS (EST) using Internet Protocol Number 207.69.169.92." Id. at 505.  In response, MindSpring complied with the subpoena and provided the government with the information requested, including

6

defendant's name and the fact that defendant had been connected to the Internet at the IP address.

Id.  Because a justice of the peace, who was also a detective in the Keene Police Department,

Investigation Division, had issued the warrant, however, the government conceded that the

warrant was invalid because the justice of the peace had not issued the subpoena pursuant to a

matter pending before himself, any other judicial officer, or a grand jury.   Id. at 506.  Defendant

argued that the court must suppress the information obtained from MindSpring, and all that

flowed from it, because the government had failed to obtain a proper subpoena.  Id.

In denying defendant's motion to suppress, the court reasoned that defendant had no

reasonable expectation of privacy in that information because the subscriber agreement between

defendant and MindSpring did not proscribe MindSpring from revealing defendant's personal

information to nongovernmental entities.  Id. at 508.

> When the defendant selected his screen name it became tied to his true identity in
> all MindSpring records.  Id.  Mindspring employees had ready access to these
> records in the normal course of MindSpring's business, for example, in the
> keeping of it records for billing purposes, and nothing prevented MindSpring from
> revealing this information to nongovernmental actors.

Id.  The court explained that "[w]here such dissemination of information to nongovernment

employees is not prohibited, there can be no reasonable expectation of privacy in that

information."  Id. at 509.

Courts addressing the issue subsequent to Hambrick have reached the same conclusion.

For example, in United States v. Kennedy, 81 F. Supp. 2d 1103 (D. Kan. 2000), defendant sought

to suppress the subscriber information that the FBI had received from the ISP on the grounds that

the government had not provided specific and articulable facts in support of its request for a court

order.  The court concluded that defendant did not have a Fourth Amendment privacy interest in

his subscriber information because "[w]hen [he] entered into an agreement with Road Runner for Internet service, he knowingly revealed all information connected to the IP address." <u>Id.</u> at 1110. <u>See</u> <u>also</u> <u>Guest v. Simon</u>, 255 F.3d 325, 336 (6th Cir. 2001)  (concluding that "computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person–the system operator").

In this case, Defendants argue that they could not have violated Plaintiff's Fourth Amendment rights because, like the Plaintiff in <u>Hambrick</u>, Plaintiff had no objectively reasonable expectation of privacy, as his contract with AOL permitted AOL to release subscriber information to non-governmental entities, and also to governmental entities when presented with a valid warrant.  Plaintiff counters, however, that in this case, unlike in <u>Hambrick</u>, his expectation of privacy was one that society would be willing to accept as reasonable because the agreement between him and AOL limited AOL's right to release his screen name to third parties. The court is not persuaded that the facts of this case, although distinguishable from those in <u>Hambrick</u>, support the conclusion that Plaintiff's subjective expectation of privacy is one that society would be willing to accept as objectively reasonable and, thus, entitled to Fourth Amendment protection.

Like the Defendant in <u>Hambrick</u>, Plaintiff in this case was not a completely anonymous actor.  He provided his name, address, credit card number, and telephone number to AOL when he registered to obtain Internet access from AOL.  That information was exposed to AOL employees in the normal course of business, as evidenced by AOL's compliance with Defendants' request for Plaintiff's subscriber information.  In addition, Plaintiff's screen name was directly linked to his true identity in AOL's records.

8

The distinction upon which Plaintiff places the emphasis of his argument–that AOL's privacy policy with Plaintiff provided, among other things, that it "will not give out information that would link your screen names with your actual name, except where needed to deliver a product or service you ordered"–is tempered by two express exceptions. First, the agreement permitted AOL to reveal Plaintiff's subscriber information "where needed for deliver[ing] a product or service" ordered by Plaintiff. Although Defendant has not proffered any evidence establishing to whom, if anyone, AOL revealed subscriber information and, if so, the frequency of any such dissemination, the fact that the agreement expressly permitted AOL to reveal Plaintiff's subscriber information when necessary for providing the service requested substantially diminishes the reasonableness of Plaintiff's expectation of privacy. The agreement also provided that AOL "will release specific information about your account only to comply with valid legal process such as a search warrant, subpoena or court order, or *in special cases such as a physical threat to you or others*." (Id.) (Emphasis added.) AOL's promise was not absolute, as it had expressly informed Plaintiff that it may, in limited circumstances, reveal his subscriber information. This provision accords with the ECPA, which permits an ISP to voluntarily divulge a subscriber's customer information "to any person other than a governmental entity," as well as "to a governmental entity, if the provider reasonably believes that an emergency involving immediate danger of death or serious physical injury to any person justifies disclosure of the information." 18 U.S.C. § 2702 (c)(5),(6) (Supp. 2004). In a previous ruling, the Court concluded that the facts of this case do not indicate that the email recipients were in "immediate danger of death or serious physical injury." That conclusion, however, does not negate the fact that both the ECPA generally, and the Agreement specifically, both permitted

AOL to voluntarily provide the government with information. The Court is persuaded that

society would not consider Plaintiff's expectation of privacy as objectively reasonable and

therefore is not entitled to Fourth Amendment protection.

### B.     First Amendment

Defendants next argue that they did not violate Plaintiff's First Amendment rights by

obtaining his identity from AOL because they reasonably considered his anonymous email a

threat and, thus, not entitled to First Amendment protection. Alternatively, Defendants argue that

even assuming that they violated Plaintiff's First Amendment right to anonymous speech, they

are nevertheless protected by the doctrine of qualified immunity because they were obligated to

investigate the incident. Plaintiff counters, however, that the First Amendment protects

anonymous speech on the Internet and that Defendants were familiar with the context of

Plaintiff's email. Consequently, he contends that Defendants knew that Plaintiff's email was not

a threat, and that they compelled AOL to disclose Plaintiff's identity not pursuant to a legitimate,

good faith law enforcement investigation, but as a favor to Carol-Mirylees. The Court will first

determine whether the plaintiffs have alleged a violation of a constitutional right, and then, if

they have, determine whether the right was clearly established at the time of the alleged violation.

African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 359 (2d Cir. 2002).

"When speech touches on matters of public political life, such as debate over the

qualifications of candidates, discussion of governmental or political affairs, discussion of

political campaigns, and advocacy of controversial points of view, such speech has been

described as the 'core' or 'essence' of the First Amendment." McIntyre v. Ohio Elections

Comm'n, 514 U.S. 334, 346-47, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995). Although

anonymous speech is entitled to First Amendment protection, threatening communications are not.  See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334; Mozzochi v. Borden, 959 F.2d 1174, 1178 (2d Cir. 1992).  Because Defendants do not contend that Plaintiff's email constituted speech for First Amendment purposes, the Court focuses its inquiry on whether Plaintiff has established a genuine issue of material fact that a reasonable police officer would have considered the email a threat.

"When determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether 'the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . .'" New York v. Operation Rescue Nat'l, 273 F.3d 184, 196 (2d Cir. 2001) (quoting United States v. Kelner, 534 F.2d 1020, 1027 (2d Cir.), cert. denied, 429 U.S. 1022, 50 L. Ed. 2d 623, 97 S. Ct. 639 (1976)).  An unequivocal statement is "[c]lear, plain; capable of being understood in only one way, or as clearly demonstrated."  Black's Law Dictionary 1528 (6th ed. 1990).  The United States Court of Appeals for the Second Circuit has consistently expressed a preference for having juries determine whether the words at issue constitute a true threat or mere political hyperbole for First Amendment purposes.  See United States v. Carrier, 672 F.2d 300, 306 (2d Cir. 1982) (concluding that defendant's intention when uttering his words and the circumstances surrounding their use, presented issues of fact to be tried by a jury); United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994) ("Whether a given writing constitutes a threat is an issue of fact for the trial jury.").  "The test is an objective one–namely, whether an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury.  In making this

determination, proof of the effect of the alleged threat upon the addressee is highly relevant."
United States v. Malik, 16 F.3d at 49 (internal quotation marks and citations omitted); see also
United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990) ("alleged threats should
be considered in light of their entire factual context, including the surrounding events and
reaction of the listeners").   Whether the First Amendment protects an activity depends upon a
judicial determination of the scope of the First Amendment applied to the facts of the case.   See
Dennis v. United States,  341 U.S. 494, 511, 71 S. Ct. 857, 95 L. Ed. 1137 (1951).

The Court is persuaded that Plaintiff has established a genuine issue of material fact as to
whether a reasonable person would have believed that his email, considered in light of the entire
factual context, was a threat and, accordingly, unprotected by the First Amendment, or mere
political hyperbole and, thus, entitled to its protection. See Amnesty Am. v. Town of W.
Hartford, 288 F.3d at 470 (explaining that "[a] party opposing a properly brought motion for
summary judgment bears the burden of going beyond the pleadings, and "designating 'specific
facts showing that there is a genuine issue for trial.") (internal quotation marks omitted).
Plaintiff's email message stating "the end is near" was not clear or plain on its face, and it did not
suggest an unequivocal or unconditional threat.   Furthermore, the police officers' testimony
bolsters the conclusion that a reasonable person familiar with the context of the email would
have considered, and in fact did consider, Plaintiff's email political hyperbole.   See Johnson v.
Ganim, 342 F.3d 105, 113 (2d Cir. 2003) (concluding that "neither the language used nor the
relevant context of the letter here compels the conclusion that plaintiff's speech was a threat").
For example, Captain Paul Dyer, the first police officer Mulligan contacted regarding the email
after conferring with Carrol-Mirylees, stated that "I was convinced it was a fireman because of

12

the "go Mary, go away," and that he had "chuckled about it" and "laughed too." (Pl.'s Mem. at 6.) Dyer also explained that Chief Sambrook "thought [the email] was [sent by] a fireman, too," that the phrase "go Mary, go away" was reminiscent of the "go John, go away" campaign," and that he had "laughed too." (Pl.'s Mem. at 6-7.) Lieutenant Lyddy also testified that he stated to Mulligan that he "drew a correlation that this could be a parody to the . . . political situation with the fire department a year or two ago. (Pl.'s Mem. at 7.) In addition, Sergeant Palazzolo explained that the "go Mary, go away" email "looked similar in structure to the [go John, go away campaign] . . . used by firefighters in Fairfield previously." (Pl.'s Mem. at 7-8.)

Because Plaintiff has established a genuine issue of material fact regarding whether his statement constituted a threat or mere political hyperbole and, Defendants' motion for summary judgment must be denied unless Defendants are entitled to qualified immunity for their conduct.

### C.     Qualified Immunity

Defendants contend that assuming arguendo that they violated Plaintiff's First Amendment rights, they would nonetheless be immune from liability under the doctrine of qualified immunity. Although Defendants concede that the First Amendment protects anonymous and pseudonymous speech, they argue that a reasonable person would have considered Plaintiff's email a threat and, thus, unprotected by the First Amendment. In addition, Defendants contend that there is no constitutional right to be free from investigation and that, based upon Mulligan's and Brandt's concerns, they were obligated to consider the email a threat.

"Public officials sued in their individual capacity are entitled to qualified immunity from suit unless 'the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Back v. Hastings on Hudson Free School

13

Dist., 365 F.3d 107, 129 (2d Cir. 2004) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 97

L. Ed. 2d 523, 107 S. Ct. 3034 (1987)). "[E]ven assuming a state official violates a plaintiff's

constitutional rights, the official is protected nonetheless if he objectively and reasonably

believed that he was acting lawfully." Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004).  In

assessing whether a defendant is entitled to qualified immunity for his actions, we must

determine: (1) whether the right in question was defined with "reasonable specificity"; (2)

whether the decisional law of the Supreme Court and the applicable circuit court support the

existence of the right in question; and (3) whether under preexisting law a reasonable defendant

official would have understood that his or her acts were unlawful.  Jermosen v. Smith, 945 F.2d

547, 550 (2d Cir. 1991).  Simply, there is no constitutional right to be free of investigation.

Chance v. Cundy, 2004 U.S. Dist. LEXIS 12191, citing United States v. Trayer, 283 U.S. App.

D.C. 208, 898 F.2d 805, 808 (D.C. Cir. 1990).

    As discussed in Part B, an author's anonymity with regard to political speech is a

constitutional right protected by the First Amendment and has been defined with reasonable

specificity.  See, e.g.,  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341-42, 131 L. Ed. 2d

426, 115 S. Ct. 1511 (1995).  In addition, the decisional law of both the United States Supreme

Court and the United States Court of Appeals for the Second Circuit support the existence of this

right.  See, e.g., NAACP v. Alabama, 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958)

(holding that the State of Alabama could not compel the NAACP to reveal to the State's Attorney

General lists of its members' names and addresses.); McIntyre v. Ohio Elections Comm'n, 514

U.S. 334 (invalidating an Ohio statute that prohibited the distribution of anonymous campaign

literature); Talley v. California, 362 U.S. 60, 4 L. Ed. 2d 559, 80 S. Ct. 536 (1960) (invalidating a

Los Angeles ordinance that prohibited the distribution of handbills without the names and addresses of persons who prepared, distributed, or sponsored the handbills); Bates v. City of Little Rock, 361 U.S. 516, 4 L. Ed. 2d 480, 80 S. Ct. 412 (1960) (upholding the NAACP's refusal to provide the names of its members to municipal tax officials); see also Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 142 L. Ed. 2d 599, 119 S. Ct. 636 (1999) (holding that the First Amendment was violated by a Colorado statute that required persons who circulated petitions for an initiative to wear identification badges revealing their names); Buckley v. Valeo, 424 U.S. 1, 64, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976) ("We have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."); Church of the Am. Knights of the KKK v. Kerik, 356 F.3d 197, 209 (2d Cir. 2004) (explaining that "the First Amendment is implicated by government efforts to compel disclosure of names in numerous speech-related settings, whether the names of an organization's members, the names of campaign contributors, the names of producers of political leaflets, or the names of persons who circulate petitions.").

Finally, the Court is persuaded that under this preexisting law a reasonable police officer would have understood that the Defendants' acts in this case were unlawful. The Court has already concluded that Plaintiff has established a genuine issue of material facts regarding whether a reasonable person would have considered his email a threat. Consequently, the Court must address whether a reasonable police officer would have understood that submitting an unsigned search warrant to ascertain the identity of anonymous speaker was unlawful. Although Defendants correctly assert that "there is no constitutional right to be free of investigation," see, e.g., Sloan v. Dep't of Housing & Urban Development, 231 F.3d 10, 18 (D.C. 2000), the Court is

15

not persuaded by Defendants' suggestion that it lacked principled guidance as to what procedures must be followed to acquire an anonymous internet speaker's identity from an ISP.  See, e.g.,18 U.S.C. § 2703 (c) (requiring a governmental entity seeking such information from an ISP must comply with specific legal process, including a proper search warrant, court order, or subpoena). The Court need not, however, outline what procedures are necessary to comply with the First Amendment because the unsigned warrant Defendants' submitted in this case was not subjected to even a modicum of judicial scrutiny.

Plaintiff has also proffered evidence that not only would reasonable police officer have concluded that submitting an unsigned warrant was unlawful, but also that Defendants subjectively knew that their conduct was improper.  For example, Young testified that, when looking for internet subscriber information, he would ordinarily "present a search warrant application to a judge" for his signature before "fax[ing] a signed search warrant to the AOL legal department."  Young had also stated in a manual he had prepared that a signed warrant was required to obtain subscriber information from AOL.  The conflicting testimonies of Young and Palazzolo regarding the warrant submission process further bolster Plaintiff's suggestion of bad faith. Consequently, Defendants' are not entitled to qualified immunity for Plaintiff's First Amendment claim and, thus, Defendants' motion for summary judgment on Count Five of Plaintiff's complaint is denied.

**D.    Article First, Section 4 of the Constitution of Connecticut**

Defendants next argue that they did not violate the Plaintiff's rights under Article First,

Section 4[2] of the Constitution of Connecticut. (Defs.' Mem. Opp. at 15.) Both parties rely

primarily upon the arguments raised in sections B and C in discussing whether Defendants'

violated Plaintiff's right to free speech under the First Amendment. "It is well established that

federal constitutional and statutory law establishes a minimum national standard for the exercise

of individual rights and does not inhibit state governments from affording higher levels of

protection for such rights. . . ." State v. Geisler, 222 Conn. 672, 684, 610 A.2d 1225 (1992)

(Citations omitted; internal quotation marks omitted). Because this Court, in section B, has

already determined that Plaintiff has established a genuine issue of material fact as to whether the

email may reasonably be considered a political hyperbole protected by the First Amendment,

Plaintiff's claim under the free speech provision under the Constitution of Connecticut, which

bestows greater expressive rights on the public than does the federal constitution, likewise

survives summary judgment. See State v. Linares, 232 Conn. 380-81, 655 A.2d 737 (1995)

(explaining that "article first, §§ 4, 5 and 14 . . . include . . . language that suggests that [the

Connecticut] state constitution bestows greater expressive rights on the public than that afforded

by the federal constitution"). The court must now consider whether Defendants are entitled to

qualified immunity under Connecticut law.

### E.     Qualified Immunity Under Connecticut Law

Defendants argue alternatively that Plaintiff's state constitutional claim should be

dismissed because it is barred by the doctrine of qualified governmental immunity. Plaintiff

counters that the common law doctrine of qualified immunity applies only to common law

---

[2]Article first, § 4, of the constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

claims, not constitutional violations, and that Connecticut has not formally adopted a form of qualified immunity for violations of its state constitution.  Plaintiff argues that, at best, Connecticut case law suggests that a public official would be entitled to qualified immunity for state constitutional violations "for official actions taken reasonably and in good faith."  Under this standard, Plaintiff contends, Defendants' conduct "smacks of bad faith" and, thus, would not be protected.

Plaintiff correctly cites Mulligan v. Rioux, 229 Conn. 716, 643 A.2d 1226 (1994), for the proposition that the common law doctrine of government immunity applies to common law claims, not federal constitutional violations.  In Mulligan, the Connecticut Supreme Court considered whether the defendants, Hartford police department detectives, were entitled to qualified immunity as a matter of law and, therefore, were immune from the common law malicious prosecution and federal civil rights claims brought by the plaintiff, Arthur Mulligan, the director of the East Hartford department of public works.  In its decision, the court distinguished the qualified immunity doctrine with respect to allegations of federal constitutional violations under 42 U.S.C. § 1983 from the qualified immunity doctrine applicable to common law claims in Connecticut.  Id. at 729-30.  The court explained that under the common law of Connecticut, municipal employees are generally immune for the performance of their governmental acts.  The court then outlined three exceptions to this rule:

> "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm [;] second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws [;] and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence."

18

Id. at 728 (citations and internal quotation marks omitted).  Under federal law, however, as

discussed in part D of this opinion, the court explained that "whether an official protected by

qualified immunity may be held personally liable for an allegedly unlawful official action

generally turns on the objective legal reasonableness of the action . . . assessed in light of the

legal rules that were 'clearly established' at the time it was taken . . . ." Id. at 728-29 (citations and

internal quotation marks omitted).  Essential to the court's resolution of Mulligan was the fact

that, with respect to section 1983 claims, "'an allegation of malice is not sufficient to defeat

immunity if the defendant acted in an objectively reasonable manner.'"  Id. at 729.

Although the court's analysis in Mulligan is instructive, it does not answer the question

presented in this case, namely, whether a public official would be entitled to qualified immunity

for violations of the constitution of Connecticut.  As a result, this Court must predict how the

Connecticut Supreme Court would rule by considering all the data that court would use.  See,

e.g., Birdsall v. City of Hartford, 249 F. Supp. 2d 163, 171-72 (D. Conn. 2003).

In Binette v. Sabo, 244 Conn. 23, 710 A.2d 688 (1998), the Connecticut Supreme Court

held that the Constitution of Connecticut gave rise to a private cause of action for money

damages for violations of article first, § 7, and article first, § 9.  In a one paragraph concurring

and dissenting opinion, Justice McDonald expressed his belief that the majority's decision would

have a "chilling effect on law enforcement officers" who, when making split second decisions to

protect the public's safety and their own, "may rely upon United States Supreme Court decisions

and yet be forced to pay damages for intricate state constitutional violations.  Binnette, 244 Conn.

at 85.  In explaining its decision and responding to Justice McDonald's concern, the court

explained that:

> police officers who engage in constitutionally impermissible conduct already may be sued under 42 U.S.C. § 1983 and, like all other citizens, they also are subject to state common-law claims.  It is hardly a startling proposition, therefore, that the *police also may be held civilly liable for clear violations of our state constitution*. More importantly, however, the egregious misconduct alleged to have occurred in this case is a far cry from the conduct of police officers who, like those depicted by Justice McDonald in his concurring and dissenting opinion, *traditionally are shielded from liability*, *under both state and federal law*, for official actions undertaken reasonably and in good faith.

Binnette, 244 Conn. at 50 n.23 (emphasis added).

Although not expressly stated, the Court believes that it is appropriate to infer from the majority opinion's reference to Justice McDonald's concerns regarding state constitutional violations that police officers are entitled to qualified immunity for state constitutional violations. The majority summarized the traditional standard for qualified immunity, both state and federal, as appropriate for official actions undertaken reasonably and in good faith.  Although such actions would likely satisfy both the state and federal standard for qualified immunity, the Court is persuaded that the majority's use of the terms "reasonable" and "good faith" more closely tracks the federal standard.  As a result, for the reasons set forth in section C of this opinion, in which this Court determined that Defendants were not entitled to qualified immunity for Plaintiff's First Amendment claim, Defendants are likewise not entitled to qualified immunity for Plaintiff's claim that they violated his rights under the Connecticut constitution, article first, § 4.

### F.    Article 1, Section 7 of the Constitution of Connecticut

Defendants next argue that summary judgment should enter on Count Seven of Plaintiff's complaint because they did not violate Plaintiff's rights under Article 1, § 7[3] of the Constitution

---

[3]Article 1, § 7 of the Constitution of Connecticut provides that "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without

of Connecticut, as Plaintiff did not have an objectively reasonable expectation of privacy in his subscriber information. Defendants rely primarily upon the arguments discussed in Part A, in which they argued, and this Court agreed, that, based upon a limited number of federal cases addressing the issue, society does not recognize an expectation of privacy in non-content internet subscriber information. Although Plaintiff concedes that no Connecticut appellate court has addressed this issue, he points to decisions in which other states, under their respective state constitutions, have recognized a privacy interest in certain types of information that an individual provides to a third party. See, e.g., Burrows v. Superior Court of San Bernardino County, 529 P.2d 590 (1974) (concluding that a bank customer had a reasonable expectation of privacy in his bank records); Charnes v. DiGiacomo, 612 P.2d 1117 (1980); Commonwealth v. DeJohn, 403 A.2d 1283 (1979).

The test for standing under article first, § 7 of the Connecticut constitution is the same under the United States Constitution. See, e.g., State v. Defusco, 224 Conn. 627, 633, 620 A.2d 746 (1993). Thus, as outlined in part A, article first, § 7, the Connecticut constitution prohibits unreasonable searches and seizures and affords protection only against invasions of reasonable expectations of privacy. See, e.g., State v. Hill, 237 Conn. 81, 92, 675 A.2d 866 (1996); State v. Joyce, 229 Conn. 10, 20, 639 A.2d 1007 (1994). "Absent such an expectation, the subsequent police action has no constitutional ramifications." State v. Brown, 198 Conn. 348, 355, 503 A.2d 566 (1986). The party opposing the search has the burden of proving that he had a reasonable expectation of privacy in the premises. State v. Hill, 237 Conn. at 92-93.

---

describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

21

Although the tests under the federal and state constitutions are identical, "it is well established that federal constitutional and statutory law 'establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." State v. Geisler, 222 Conn. 672, 684, 610 A.2d 1225 (1992).  As a result, the Connecticut Supreme Court has determined, in some instances, that the Connecticut constitution affords citizens of this state more protection than the federal constitution, as interpreted by the United States Supreme Court. Id.  (Citing State v. Dukes, 209 Conn. 98, 112, 547 A.2d 10 (1988); State v. Stoddard, 206 Conn. 157, 166, 537 A.2d 446 (1988); State v. Kimbro, 197 Conn. 219, 235-36, 496 A.2d 498 (1985).)  More specifically, the Connecticut Supreme Court has, on a number of occasions, held that Article First, § 7 of the constitution of Connecticut provides an individual with more protection than under the federal Fourth Amendment.  See, e.g., State v. Miller, 227 Conn. 363 (concluding that a warrantless automobile search supported by probable cause, but conducted after the automobile has been impounded at the police station, violates article first, § 7, of the Connecticut constitution);  State v. Diaz, 226 Conn. 514, 544-47, 628 A.2d 567  (1993) (rejecting defendant's claim that article first, § 7 required de novo review of the probable cause determination made by a judge issuing a warrant, in part because of its concern that such review would discourage the police from seeking warrants); State v. Geisler, 222 Conn. at 695-96 (concluding that police must retreat from a house that they have entered pursuant to the emergency exception as soon as the emergency ceases to exist).

In this case, both parties focus on one of the six tools that the Connecticut Supreme Court

utilizes when interpreting the Connecticut constitution.  State v. Geisler, 222 Conn. at 695-96.[4]

Plaintiff focuses on sibling state precedent, while Defendant focuses on federal precedent

interpreting the Fourth Amendment.  The Court surmises that the parties' failure to exhaust the

Geisler tools of constitutional analysis resulted in part from the dearth of jurisprudence,

Connecticut or otherwise, directly addressing the issue.  Indeed, the parties do not cite, and the

Court's research has not revealed, any cases directly controlling the present case.  Furthermore,

as opposed to the sibling state cases cited by Plaintiff, no Connecticut appellate court has

addressed the expectation of privacy with respect to the remotely analogous cases of bank record,

credit card, or telephone record information.  The Court, therefore, does not have the benefit of a

Geisler analysis from the parties in this case and also lacks principled guidance from the

Connecticut Supreme Court regarding the expectation of privacy relating to internet subscriber

information.

     A federal court may certify questions of state law directly to the Connecticut Supreme

Court "if the answer may be determinative of an issue in pending litigation in the certifying court

and if there is no controlling appellate decision, constitutional provision or statute of this state."

See Conn. Gen. Stat. § 51-199b(d) (2002).  When considering whether to certify a question to the

Connecticut Supreme Court, the Second Circuit has considered whether: (1) Connecticut

appellate precedent provides insufficient guidance on the controlling question at issue and, if so,

---

[4]In Geisler, 222 Conn. 684-85, the Connecticut Supreme Court explained that "in order to
construe the contours of our state constitution and reach reasoned and principled results, the
following tools of analysis should be considered to the extent applicable: (1) the textual approach
. . . (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent . . . (4)
sister state decisions . . . (5) the historical approach, including the historical constitutional setting
and the debates of the framers . . . and (6) economic/sociological considerations." (Citations
omitted.)

whether that authority is conclusive; (2) the interpretation of the statute or constitutional provision at implicates important public policy considerations; and (3) the issues presented in this case are likely to recur and, consequently, their resolution will assist the administration of justice in both federal and state courts.  See Parrot v. Guardian Life Ins. Co. of Am., 338 F.3d 140, 144 (2d Cir. 2003).  The Court is persuaded that all three criteria are satisfied in this case.

First, neither the Connecticut Supreme Court nor the Connecticut Appellate Court have considered whether an individual has a reasonable expectation of privacy in non-content subscriber information provided to an internet service provider.  In addition, neither court has considered whether an individual has a reasonable expectation of privacy in information provided to a third party in remotely analogous situations.  Second, "the state constitution is interpreted as a living document" and, thus, implicates important public policy considerations.  See State v. Dukes, 209 Conn. 98, 110, 115, 547 A.2d 10 (1988) ("The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens.").  Finally, although the reasonable expectation of privacy with regard to internet subscriber information has only been addressed in a limited number of cases, the proliferation of internet usage compels the conclusion that this issue is likely to recur and, thus, its resolution will assist the administration of justice in both federal and state courts.  The Second Circuit "has long recognized that state courts should be accorded the first opportunity to decide significant issues of state law through the certification process." Parrot v. Guardian Life Ins. Co. of Am., 338 F.3d at 144. The Court therefore concludes that the issue warrants certification to the Connecticut Supreme Court.  "As a result, this case involves the resolution of an important question of

Connecticut insurance law. That question turns on a statute, for the proper construction of which the Connecticut Supreme Court has given us some, but ultimately not enough, guidance." Parrot v. Guardian Life Ins. Co. of Am., 338 F.3d 140, 144 (2d Cir. 2003).

In light of the above, the Court respectfully certifies the following question to the Connecticut Supreme Court:

> "Would society consider reasonable an individual's expectation of privacy in internet subscriber information and, thus, subject to the protection against unreasonable searches and seizures under article first, § 7 of the constitution of Connecticut?"

The Connecticut Supreme Court is invited "to construe liberally and, if necessary, expand this certified question to address related or other relevant issues in connection with this appeal." Caruso v. Siemens Bus. Commun. Sys., 392 F.3d 66, 72 (2d Cir. 2004). This Court shall "retain jurisdiction over the case once the Supreme Court has either ruled on the certified question[] or has declined certification." Id.

### G.    Invasion of Privacy

Defendants next move for summary judgment as to Count Eight of Plaintiff's Complaint on the grounds that they did not they did not invade his privacy under Section 652D of the Restatement (Second) of Torts. Plaintiff counters that Defendants have sought summary judgment under the wrong theory of invasion of privacy, as his complaint pled the "intrusion upon seclusion" tort under Section 652B of the Restatement (Second) of Torts. Plaintiff argues, alternatively, that had Defendants moved for summary judgment on Plaintiff's "intrusion upon seclusion" claim, the motion would nevertheless be without merit because whether an intrusion is "highly offensive to a reasonable person" is a question of fact properly reserved for the jury.

This Court construes Plaintiff's complaint as alleging that Defendants' are liable for invading his privacy by intruding upon his seclusion as defined under 252B, as the language of Plaintiff's complaint more closely tracks the title and definition of that section.  In addition, in response to Defendants' characterization of Plaintiff's invasion of privacy claim as arising under 252D, publicity given to private life, Plaintiff, in his Memorandum in Opposition to Defendants' Motion for Summary Judgment, indicated to Defendants that his Complaint alleged a violation of 252B.  Defendants, however, did not file a reply brief contesting Plaintiff's characterization of his claim and did not move for summary judgment with respect to that claim by addressing the elements of 252B.  Although a reply brief is not required and the absence of a reply brief will not prejudice the moving party, Defendants' failure to address the merits of Plaintiff's claim in Count Eight of his Complaint necessitates the denial of Defendants' motion for summary judgment with respect to that count.

### H.     Municipal Liability

Defendants move to dismiss Count Eleven[5] of Plaintiff's complaint, which alleges that the Town is liable for Young's and Bensey's actions under the doctrine of respondeat superior. Defendants argue that neither the Town nor the Fairfield Police Department had a policy or custom, at the time of this incidence, adopted by a person with final policymaking authority, permitting an officer investigating an alleged internet crime to submit to an ISP a search and seizure warrant, seeking non-content subscriber information, and without bearing a judge's signature.  Defendants contend that the Town trained its officers on the proper procedures for

---

[5]For clarity and flow, Count Eleven of Plaintiff's complaint is addressed before Count Nine.

executing a warrant and that Plaintiff's Complaint in this case "was the first and only complaint the Fairfield Police Department had received of its nature." (Defs.' at 27.) Plaintiff counters that the Town had an unconstitutional policy permitting its officers to submit warrants, which did not bear a judge's signature, to ISPs.

Defendants correctly indicate that a municipality may not be held liable under § 1983 on a theory of respondeat superior.[6] See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 124-25 (2d Cir. 2004). "In Monell v. Department of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978), [however] the Supreme Court established that 'local governing bodies . . . can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.' Id. at 690." Amnesty Am. v. Town of W. Hartford, 361 F.3d at 124-25. "Monell established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal

_____

[6]Defendants also argue in their memorandum in opposition that the Town is afforded governmental immunity from suit for the tortious acts of its employees unless that protection is abrogated by statute. They contend that because the Eleventh Count of Plaintiff's complaint fails to plead a statute abrogating Defendants' governmental immunity, Plaintiff is not entitled to recover under this theory. Defendants argue further that even if Plaintiff claims that the Town would be liable for Young's and Bensey's actions under Conn. Gen. Stat. § 52-557n, this cause of action would fail because Conn. Gen. Stat. § 52-557n(a)(2)(B) provides that "a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts of omission which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Plaintiff's memorandum in opposition addresses only the Town's alleged liability under § 1983. Accordingly, this Court's decision regarding Defendant's motion for summary judgment on Count Eleven is limited to a discussion regarding the Town's alleged liability under § 1983.

27

policy may be considered the act of the municipality itself." <u>Id.</u> at 125.  Subsequent to its

decision in <u>Monell</u>, the United States Supreme Court has expanded its definition of "official

municipal action." Although an "official policy" often refers to formal rules or understandings, a

single action taken by a municipality is sufficient to expose it to liability.  <u>Amnesty Am.</u>, 361

F.3d at 125.

  Plaintiff points to Sambrook's deposition testimony, in which he stated that Captain Dyer

had informed him that AOL would accept a Connecticut search warrant that did not bear a

judge's signature.  Sambrook explained that "that's the procedure that AOL had always used and

that it had been questioned in the past and that it was never challenged and that that's the way

they operate and it was acceptable." (Pl.'s Br. At 31.)  In addition, Young testified that Palazzolo

told him that sending an unsigned warrant was the proper procedure.  (Pl.'s Br. At 32.)

Defendant counters that Young testified that prior to April 1, 2003, it was his practice to submit

search and seizure warrant applications to a local judge for signature before submitting it to an

ISP.  (Defs.' Br. At 29.)  Defendants also point to Palazzolo's testimony, which indicated that he

understood that the procedure for obtaining non-content subscriber information from AOL was to

send a search and seizure warrant application that had not been signed by a local judge to a local

sheriff's office and that they would transcribe the application onto a local warrant to be signed by

a local judge.  (Defs.' Br. At 30.)  Defendant characterizes Young and Palazzolo testimony as

evidence for a miscommunication regarding procedure, and not a policy.

  This Court is persuaded that Plaintiff has established a genuine issue of material fact as to

whether the Town had an unconstitutional official policy permitting its officers to send unsigned

warrants to ISPs for subscriber information.  Plaintiff has proffered evidence that Young

understood that the Town, although not having a formal rule, had adopted a particular course of action–sending unsigned search warrants to ISPs–which, according to the testimony of Young and Sambrook, had been followed consistently over time.  See Pembaur, 475 U.S. at 480-81.  Accordingly, Defendant's motion for summary judgment on Count Eleven of Plaintiff's Complaint is denied.

## I.    Failure to Train or Supervise

Defendant, Town of Fairfield, next moves for summary judgment on Count Nine of Plaintiff's complaint, which alleges that the Town "failed or refused to adequately train, supervise,[7] and/or monitor Young and Bensey regarding the investigation of alleged criminal activity and the search and seizure of the private information of citizens" on the grounds that the town is not liable for Defendants' Young's and Bensey's conduct because there is no genuine issue of material fact in dispute as to the fact that the Fairfield Police Department trained its officers on the proper procedure for executing a search and seizure warrant.  Plaintiff counters that the evidence establishes that both Chief Sambrook and Captain Dyer believed that the department's policy permitted officers to send unsigned search warrants to ISPs.

### i.    Failure to Supervise

Plaintiff alleges that the Town failed to supervise Young and Bensey regarding the investigation of the alleged criminal activity and the search and seizure of the private information

---

[7]Count Nine of Plaintiff's Complaint alleges two distinct theories of municipal liability–"failure to supervise" and "failure to train." Accordingly, each is addressed in turn.  See, e.g., Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (explaining that because the failure to supervise and failure to train theories emphasize different facts and require different showings in order to establish deliberate indifference, "they must be analyzed independently, rather than evaluated collectively") (Pl.'s Compl ¶ 70).

of the Plaintiff.  A municipality may be liable for failing to supervise its employees if its

policymakers were "'knowingly and deliberately indifferent to the possibility that its police

officers were wont to violate the constitutional rights of arrestees.'"  Amnesty Am., 361 F.3d at

127, quoting Fiacco v. City of Rensselaer, 783 F.2d 319, 326-27 (2d Cir. 1986).  In Vann, the

United States Court of Appeals for the Second Circuit explained that a plaintiff may establish

"deliberate indifference" by "show[ing] that the need for more or better supervision to protect

against constitutional violations was obvious," and that the policymaking official made "no

meaningful attempt to forestall or prevent the unconstitutional conduct."  Id. at 1049.  "The

operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a

'conscious choice' rather than mere negligence."  Amnesty Am., 361 F.3d at 128 (internal

quotation marks omitted).

Defendant contends that there is no genuine issue of material fact that neither the Town

nor the Police Department had prior notice of its citizen's rights being violated in the manner

described in the complaint.  They also point to the fact that this case presents the first complaint

that has been filed against Young.  In addition, Defendants aver that, prior to the commencement

of the current action, the Fairfield Police Department had never received a complaint that Bensey

had attempted to serve a search and seizure warrant on an ISP that had not been signed by a

judge.  Defendant's argument is unpersuasive, however, because although a policymaker's

deliberate indifference may be established by a failure to respond to repeated complaints, such a

showing is not required.  Amnesty Am., 361 F.3d at 128.

Plaintiff has proffered evidence sufficient to establish a genuine issue of material fact as

to whether the necessity for more supervision was obvious at the time that Young sent the

warrant, without a signature by a judge, to AOL and that the city's policymakers ignored the alleged constitutional violations in progress.  Plaintiff alleges that Sergeant Palazzolo informed him that his warrant application did not "need[] to be signed by a judge" and that "it could be forwarded directly to AOL legal." (Pl.'s Br. at 10.)  Plaintiff, however, has not proffered any evidence establishing that Palazzolo possessed municipal policymaking authority.   On the one hand, Plaintiff has established that Chief Sambrook, whom Defendants do not contest possessed policymaking authority, testified that AOL would accept a warrant that did not bear a judge's signature, and that Dyer informed him that its policy "had been questioned in the past and that it was never challenged" and that it was acceptable.  On the other hand, however, Plaintiff has not established, as did the Plaintiffs in Amnesty and Vann, that the police witnessed or encouraged the incidence of unconstitutional conduct.  In consequence, Plaintiff has raised a genuine issue of material fact as to Sambrook's "conscious choice," as opposed to mere negligence, not to change the policy.  The fact that Sambrook stated that the policy had been questioned in the past establishes that Sambrook "had notice of a potentially serious problem of unconstitutional conduct, that the need for corrective action or supervision was 'obvious,' [and that his] failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." See Amnesty Am., 361 F.3d at 128 (internal citation omitted).

### ii.    Failure to Train

Plaintiff also argues that the Town's failed to train its officers on the proper method for submitting warrants to ISPs.  In City of Canton v. Harris, 489 U.S. 378, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989), the United States Supreme Court explained that a municipality will be liable for failing to train its employees when "the failure to train amounts to deliberate indifference to

the rights" of those with whom its employees will come into contact." Id. At 388.  Plaintiff must proffer evidence establishing that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, and that although the need for corrective action was obvious, he failed to investigate or rectify the situation.  See Amnesty Am., 361 F.3d at 128.  In Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992), the United States Court of Appeals for the Second Circuit explained that "three requirements must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens.  First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation [City of Canton v. Harris, 489 U.S. 378, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989)]. . . . Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . . Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  Id. at 297-98 (internal quotation marks and citations omitted.)

In this case, Plaintiff has proffered evidence establishing a genuine issue of material fact as to these three elements.  First, the Town reasonably should have known to a moral certainty that the officers would confront situations in which they would need to execute a warrant for an individual's ISP subscriber information.  The fact that police officers routinely execute search warrants, combined with the proliferation of internet use, makes it evident that the officers would increasingly confront the situation presented in this case.  Furthermore, the Town's officers testified that the town had established procedures for sending warrants to ISPs.  Sambrook

testified that "that's the procedure that AOL had always used and that it had been questioned in the past and that it was never challenged and that that's the way they operate and it was acceptable." (Pl.'s Br. at 31.)  In addition, Young testified that Palazzolo told him that sending an unsigned warrant was the proper procedure.  (Pl.'s Br. at 32.)  Defendants point out that the Town provided its officers with training.  The most recent training provided to either Young or Bensey, however, occurred more than ten years before the incident involved in this case.  Second, the situation presented the Defendant officers with a difficult choice of the sort that training or supervision would make less difficult.  The choice in this case was not difficult by way of degree. Rather, it was a choice in which Young, with the proper training, could have presented the warrant application to a judge before sending it to the ISP.  It was therefore a situation that would have made Young's decision less difficult by guiding him as to the proper procedure.

Although there is no history of employees mishandling the situation, a single action taken by a municipality is sufficient to expose it to liability, and repeated complaints are not a prerequisite to establishing that a policymaker's inaction was the result of a 'conscious choice,' and not mere negligence.  Amnesty Am., 361 F.3d at 128.  Lastly, Young's decision to send the unsigned warrant to AOL is a wrong choice that would frequently cause the deprivation of a citizen's constitutional rights.  As previously stated, police officers routinely execute warrants to ascertain the identity of an anonymous internet speaker.  Consequently, the failure to obtain any level of judicial review of the request before it is submitted to an ISP may potentially result in violations of the First and Fourth Amendments.

Because Plaintiff has proffered evidence sufficient to establish a genuine issue of material fact, summary judgment with respect to this count is denied.

## V.    Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is granted with respect to Count Four of Plaintiff's Complaint, and denied with respect to Counts Five, Six, Eight, Nine, and Eleven of Plaintiff's Complaint.  The Court has certified to the Connecticut Supreme Court the issue presented in Count Seven of Plaintiff's Complaint.  See Part F.

_____SO ORDERED.

Dated at New Haven, Connecticut, August  _9th_ , 2005.


_____/s/_____

Peter C. Dorsey
United States District Judge