## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLIFTON S. FREEDMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: |
| v. ) | 3:03CV1048 (PCD) |
| ) | |
| THE TOWN OF FAIRFIELD, DETECTIVE ) | |
| WILLIAM YOUNG AND DETECTIVE DAVID ) | |
| BENSEY (Individually and in their official ) | |
| capacities as police officers for the Town of ) | SEPTEMBER 21, 2005 |
| Fairfield), ) | |
| ) | |
| Defendants. ) | |

## MOTION *IN LIMINE* REGARDING THE ADMISSIBILITY OF SETTLEMENT AGREEMENT

Plaintiff Clifton S. Freedman respectfully submits this motion *in limine* for a ruling precluding the admission of any evidence at trial that relates to the settlement agreement between Mr. Freedman and America Online, Inc., in the matter of *Clifton S. Freedman v. America Online, Inc.* in the United States District Court for the Eastern District of Virginia, docket no.: 1:04cv475(TSE) ("Agreement"). The Agreement is inadmissible under Rules 408 and 403 of the Federal Rules of Evidence.

Rule 408 of the Federal Rules of Evidence precludes the admission of evidence and "accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount" for the purpose of proving "invalidity of the claim or its amount." Fed. R. Evid. 408. Accordingly, courts have routinely denied the admission of evidence related to such compromises, which

**ORAL ARGUMENT IS REQUESTED**

include "situations where the party seeking to introduce [the compromise] was not involved in the original compromise." *Hudspeth v. Commissioner of Internal Revenue Service*, 914 F.2d 1208, 1213 (9th Cir. 1990)[1]; *see also Vincent v. Louis Marx & Co., Inc.*, 874 F.2d 36, 42 (1st Cir. 1989); *Belton v. Fibreboard Corp.*, 724 F.2d 500, 504-05 (5th Cir. 1984); *United States v. Contra Costa County Water District*, 678 F.2d 90, 92 (9th Cir. 1982); *Jackson v. Shell Oil Co.*, 401 F.2d 639, 643 (6th Cir. 1968); *Alpex Computer Corp. v. Nintendo Co. Ltd*, 770 F. Supp. 161, 165-167 (S.D.N.Y. 1991).

Furthermore, Rule 403 of the Federal Rules of Evidence precludes the Agreement's admissibility because any alleged probative value would be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury that would result with its admission." Fed. R. Evid. 403; *Hudspeth v. Commissioner of Internal Revenue Service*, 914 F.2d 1207, 1213 (9th Cir. 1990) (holding that "evidence of compromise is irrelevant, since the offer may be motivated by desire for peace rather than from any concession of weakness of position").

For the foregoing reasons, Mr. Freedman respectfully requests that this Court grant his Motion *In Limine*.

---

[1] Copies of cited cases are attached hereto as Exhibit A.

CKW/32442/2/71842v1
09/21/05-SPT/

Respectfully submitted,

By: _____

Daniel J. Klau (ct17957)
H. James Pickerstein (ct05094)
Calvin K. Woo (ct24951)
Pepe & Hazard LLP
Goodwin Square
225 Asylum Street
Hartford, CT  06103-4302
Phone:  (860) 522-5175
Fax:  (860) 522-2796
dklau@pepehazard.com
jpickerstein@pepehazard.com
cwoo@pepehazard.com

Robert Y. Altchiler (ct24247)
The Law Offices of Robert Y. Altchiler
590 Madison Avenue
New York, NY  10022
Phone:  (212) 541-2422

3

## O R D E R

The foregoing motion having been duly presented to this Court, it is hereby

ORDERED, GRANTED/DENIED.

THE COURT,

_____

Judge/Clerk

CKW/32442/2/71842v1
09/21/05-SPT/

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent via facsimile and first class mail, postage prepaid, this 21st day of September, 2005 to the following:

Thomas Murtha, Esq.
Maher & Murtha, LLC
528 Clinton Avenue
P.O. Box 901
Bridgeport, CT  06601
(203) 335-0589

Calvin K. Woo

CKW/32442/2/71842v1
09/21/05-SPT/

# Exhibit A

ALPEX COMPUTER CORPORATION, Plaintiff, v. NINTENDO CO., LTD. and NINTENDO OF AMERICA INC., Defendants

No. 86 Civ. 1749 (KMW)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan)
706

July 18, 1991, Decided
July 19, 1991, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff patentee sought an order from the court pursuant to Fed. R. Evid. 408 precluding defendant corporation from introducing any evidence concerning plaintiff's efforts to compromise disputed claims regarding a patent and the amounts involved in those efforts to compromise.

**OVERVIEW:** Plaintiff patentee filed a patent infringement action against defendant corporation. Prior to filing the action, plaintiff sent notice of infringement letters to several companies including defendant. Plaintiff subsequently settled with a majority of the other companies and granted them licenses. Defendant sought to introduce documents pertaining to the terms of settlement agreements and the infringement claims. Plaintiff filed a motion pursuant to Fed. R. Evid. 408 to preclude defendant from introducing the evidence. The court granted plaintiff's motion. The court held that evidence concerning plaintiff's offers to compromise was inadmissible where an actual dispute existed between the parties as to the validity of the infringement claims at the time the offers were made. The court noted plaintiff's belief that the companies to which it sent notices of infringement were indeed infringing on plaintiff's patents implied the existence of a dispute. The court found that evidence relating to licenses agreed to without litigation was also inadmissible because none of the parties that entered into a licensing agreement with plaintiff did so without the threat of litigation.

**OUTCOME:** The court granted plaintiff patentee's request to preclude defendant corporation from introducing any evidence concerning plaintiff's efforts to compromise disputed claims regarding a patent. The court held that evidence concerning plaintiff's offers to compromise was inadmissible because plaintiff's belief that companies were infringing upon plaintiff's patent implied the existence of a dispute at the time the offers were made.

**CORE TERMS:** patent, settlement, license, negotiation, licensing, infringement, infringing, pioneer, offering, video game, outside counsel, designate, infringers, infringe, difference of opinion, settlement agreement, documents relating, non-exclusive, notice, evidence relating, invalidity, infringed, settle, licensing agreement, introduce evidence, underlying policy, disputed claims, probative value, large number, rebut

**LexisNexis(TM) Headnotes**

*Evidence > Relevance > Compromise & Settlement Negotiations*

[HN1]Fed. R. Evid. 408 provides in part that evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either liability or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

*Patent Law > Ownership > Conveyances > Licenses*

*Evidence > Relevance > Compromise & Settlement Negotiations*

[HN2]All that is needed for Fed. R. Evid. 408 to apply is an actual dispute, or at least an apparent difference of opinion between the parties as to the validity of a claim.

*Patent Law > Ownership > Conveyances > Licenses*

*Patent Law > Subject Matter > General Overview*

*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*

770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan) 706

[HN3]Offers to license patents made during pending litigation are inadmissible under Fed. R. Evid. 408.

*Evidence > Relevance > Compromise & Settlement Negotiations*

[HN4]Fed. R. Evid. 408 is designed to promote the public policy favoring the compromise and settlement of disputes. It is true that complete confidentiality of settlements may promote this goal. However, Rule 408 is merely a rule of evidence, which promotes compromise in one limited way as it provides that evidence of compromise is not admissible to show invalidity of a claim or its amount. Although the intent of Rule 408 is to foster settlement negotiations, the sole means used to effectuate that end is a limitation on the admission of evidence produced during settlement negotiations for the purpose of proving liability at trial. Accordingly, the rule limits a document's relevance at trial, not its disclosure for other purposes. The issue of whether a party to a settlement agreement has publicized the existence or the terms of that agreement outside the context of the trial at hand does not enter into a court's decision under Rule 408.

*Patent Law > Claims & Specifications > General Overview*

*Patent Law > Anticipation & Novelty > General Overview*

[HN5]A pioneer patent is one that marks a distinct step in the progress of the art as opposed to a mere improvement of prior or analogous techniques. A patent found to have pioneer status merits the application of a broader scope of equivalents in determining whether a particular product infringes the patent.

*Patent Law > Ownership > Conveyances > Licenses*

*Evidence > Relevance > Compromise & Settlement Negotiations*

[HN6]Fed. R. Evid. 408 does not require exclusion when the evidence is offered for a purpose other than to prove liability for or invalidity of the claim or its amount.

*Evidence > Relevance > Confusion, Prejudice & Waste of Time*

*Evidence > Relevance > Compromise & Settlement Negotiations*

[HN7]The risks of prejudice and confusion entailed in receiving settlement evidence are such that often Fed. R. Evid. 403 and the underlying policy of Fed. R. Evid. 408, to encourage settlement require exclusion even when a permissible purpose can be discerned.

**JUDGES:**  [**1]  Kimba M. Wood, United States District Judge.

**OPINIONBY:** WOOD

**OPINION:** [*162] OPINION AND ORDER

KIMBA M. WOOD, UNITED STATES DISTRICT JUDGE

Plaintiff Alpex Computer Corporation ("Alpex") moves for an order pursuant to Federal Rule of Evidence 408 precluding defendants Nintendo Company, Ltd. and Nintendo of America ("Nintendo") from introducing any evidence concerning plaintiff's efforts to compromise disputed claims regarding the '555 patent and the amounts involved in those efforts to compromise. For the reasons set forth below, the court grants plaintiff's motion.

*Background*

This case arises from a dispute over the validity and alleged infringement of U.S. Patent No. 4,026,555 (the '555 patent), a patent that involves the earliest video games. On January 18, 1991, the court denied the parties' cross-motions for summary judgment. That opinion sets forth the facts underlying this dispute in some detail; familiarity with that opinion is assumed. The court will repeat only those facts necessary for an understanding of this motion.

Although the parties disagree over exactly how to characterize the evidence Alpex seeks to preclude, the evidence falls roughly into three categories. The first category includes documents relating to Alpex's offers to [**2] license the '555 patent to a large number of companies in the video game industry. The second category includes exhibits relating to licenses granted by Alpex to seven companies "after extensive business negotiations and without any commencement of litigation." Defendant's Mem. of Law in Opposition ("Nintendo Mem.") at 38. The third category includes licenses agreed to by four companies during litigation and certain documents relating to those licenses.

After receiving the right to sue for past infringement of the '555 patent from Fairchild Camera & Instrument Co., the original licensee of the patent, Alpex embarked on a program to combat what it viewed as widespread infringement of the patent. As part of this program, outside counsel for Alpex wrote letters to a number of companies in the video game industry in December 1979 notifying them of Alpex's view that they were infringing the '555 patent. The letter to Atari, one of the leaders in the video game industry at the time, is illustrative. Alpex's counsel informed Atari that "[a] number of the TV games which Atari is manufacturing and selling under the name PONG

770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan) 706

clearly infringe the '555 patent." Nintendo Appendix at Exh. 2. The [**3] letter concluded with Alpex offering "to extend a non-exclusive license under its patents on a royalty basis." *Id.* This notice led to "extended negotiations," Alpex Mem. of Law (Alpex Mem.) at 4, and eventually a settlement between Alpex and Atari under which Atari paid for and received a non-exclusive license. Alpex's counsel sent similar letters to Mattel and Bally. As was the case with Atari, the notice to Mattel resulted in extended negotiations, a settlement, and a license. Nintendo seeks to designate as trial exhibits a variety of documents from these two negotiations, including letters between the parties describing the negotiations over the license price, news articles about the Atari settlement, Bankruptcy Court pleadings describing the Mattel settlement, and the actual license agreements. *See* Alpex Mem. at 4-5.

In 1983, after the settlement with Atari and another with Magnavox, counsel for Alpex sent infringement letters to approximately 70 companies. These letters announced that Alpex had recently granted licenses under the patent to Atari and Magnavox, and stated that Alpex had "recently obtained information indicating that your company manufactures and/or sells [**4] video game cartridges and/or consoles which may infringe the subject patent." Nintendo App. at Exh. 3. "We would prefer to resolve this matter without litigation," the letters continued, "and the purpose of this letter is to advise you that our client is prepared to extend a nonexclusive license under the '555 patent on a paid-up or royalty basis." *Id.*

As a result of Alpex's efforts, as expressed in these and subsequent letters, six companies entered into license agreements with Alpex without litigation, including [*163] Mattel, Imagic, Sierra-on-Line, Texas Instrument, IBM, and Epyx. From the course of the negotiations leading to these licenses, defendants seek to designate as trial exhibits numerous documents that discuss the history of the negotiations, disputes over the size of the settlement offers, the license agreements themselves, and bankruptcy court documents describing and approving the agreements.

As part of its campaign, Alpex sued six companies alleged to have sold or manufactured products that infringed on its patent. The first suit filed was against Magnavox in 1981 and was settled, with Magnavox receiving a non-exclusive license, in December 1982. Several years later, [**5] Alpex brought suit against five additional companies: Activision, Coleco, Commodore, Tandy, and Parker Brothers. Alpex has agreed to settle with four of the companies; the action against Parker Brothers has been stayed pending the outcome of this case. Nintendo wishes to designate as

trial exhibits a variety of documents that pertain to these actions, including documents setting forth the terms of settlement and various letters between Alpex and the prospective licensees.

*Discussion*

I. *Preclusion Under Rule 408*

[HN1]Federal Rule of Evidence 408 provides, in pertinent part, that:

Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either liability or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Alpex argues simply that the same considerations that led to the enactment of this rule, namely "the promotion of the public policy favoring the compromise and settlement of disputes," [**6] F. R. Evid. 408 advisory committee's note, compel the granting of this motion. Faced with widespread infringement of its patent over a long period of time, Alpex contends, the company followed a reasonable course of action in alerting companies it believed were infringing the patent and then attempting to negotiate a settlement or filing suit or both, as the circumstances warranted.

A. Evidence of Unsuccessful Offers to License the Patent

Nintendo counters with several different arguments. It argues first that, as to the documents relating to Alpex's licensing offers that did not result in a completed agreement, Rule 408 does not apply because no actual dispute existed at the time. Nintendo characterizes Alpex's offers to license the patent as merely the "opening gambit" in an expected negotiation and thus not protected by the privilege afforded offers to compromise. Because some of those licensing offers never received a response, Nintendo argues, no dispute could possibly have existed, and Rule 408 does not bar the admission of these offers.

Nintendo's reading of this requirement of Rule 408, however is too narrow. [HN2]All that is needed for Rule 408 to apply is an actual dispute, [**7] or at least an apparent difference of opinion between the parties as to the validity of a claim. *Dallis v. Aetna Life Ins. Co.,* 768 F.2d 1303, 1307 (11th Cir. 1985); 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, para. 408[01] at 408-10 (1990). At the time it began its efforts to license the '555 and related patents, Alpex believed that many companies in the industry sold or

770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan) 706

manufactured products that infringed the patents. It is reasonable to assume that the alleged infringers believed either (1) that their products did not infringe the patent in question, or (2) that even if they did, the patent was not valid, or (3) that they could somehow get away with infringing. Alpex's offers to license the patent were sent only to those it believed were infringing on the patent. Nintendo would read these letters, in essence, as part of an irreducible whole; without a response, the letters could not be evidence of a dispute, because two parties are necessary for a dispute to exist. But this logic assumes that communications in **[*164]** response to Alpex's infringement letters are required in order for this court to hold that a dispute existed between the parties. This is not **[**8]** the case. By infringing on the patent, or at least selling products that Alpex reasonably believed were infringing on the patent, the infringers signalled that they held an opinion at variance with Alpex's position. The dispute or difference of opinion begins with the act of infringement; Alpex's letters -- those that provoked responses as well as those that did not -- were offers to compromise that dispute and thus fall within the ambit of Rule 408.

Such a result is consistent with the underlying policy of the rule. Each case of infringement represents a potential lawsuit. By offering to settle what it viewed as meritorious infringement claims, Alpex hoped to avoid litigation, a hope it made explicit in some of the letters sent to alleged infringers. *See, e.g.,* Nintendo App. at Exh. 3 (Letter to Answer Software Corp.: "We would prefer to resolve this matter without litigation."). This is not a case where application of Rule 408 would have the effect encouraging baseless threats of litigation. *See Ullmann v. Olwine, Connelly, Chase, O'Donnell, and Weyher,* 123 F.R.D. 237, 243 (S.D. Ohio 1987) (Rule 408 aims to promote dispute resolution, not threats of litigation). **[**9]** Alpex's belief that the companies to which it sent notices of infringement were indeed infringing on Alpex's patents implied the existence of dispute or a difference of opinion sufficient to meet the threshold requirement of Rule 408.

B. Evidence Relating to Licenses Agreed to Without Litigation

Nintendo argues that none of the license agreements agreed to by Alpex without litigation is barred by Rule 408. In its view, "none of the these licenses was agreed to during litigation and none was the result of threats of imminent litigation." Rather, Nintendo argues, these licenses represent the results of ordinary business negotiations in an industry-wide licensing program, and thus Rule 408 does not apply. In support of this

position, Nintendo relies upon *Big O Tire Dealers v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1372-73 (10th Cir. 1977) (communications between parties prior to threatened litigation merely business negotiations, rendering Rule 408 inapplicable), *cert. dismissed,* 434 U.S. 1052, 54 L. Ed. 2d 805, 98 S. Ct. 905 (1978). But even *Big O,* Nintendo's principal support for its position, makes clear that litigation need not have actually commenced for Rule 408 **[**10]** to apply. In upholding the lower court's refusal to exclude evidence of certain settlement discussions between the parties, the court held that "the point of threatened litigation [was] a clear cut-off point" for the application of the Rule 408 privilege. *Id.* at 1373. n1 Similarly, in *Olin Corp. v. Insurance Co. of North America,* 603 F. Supp. 445, 449-50 (S.D.N.Y. 1985), the court held that settlement discussions that occurred at a time when the plaintiff "contemplated" litigation, but had not yet commenced it, should be excluded under Rule 408. Here, none of the parties that entered into a licensing agreement with Alpex did so without the threat of litigation from Alpex. For example, in writing to outside counsel for Alpex, patent counsel for Texas Instruments summarized the history of licensing negotiations between the two companies, but denied that any Texas Instruments products infringed upon Alpex's patents, but concluded that when "faced with your indication of Alpex's willingness to bring suit against Texas Instruments under the '555 Patent, and recognizing the costs and inconvenience of litigation," an "offer to settle this matter" was **[**11]** warranted. Alpex App. at Exh. E. Similarly, in August 1984 the Vice President and General Counsel of Sierra-on-Line, another company Alpex accused of producing infringing products, wrote to Alpex's patent counsel outlining a licensing agreement he believed would "settle this matter without the necessity of **[*165]** litigation." Alpex App. at Exh. E. It is clear that this entire category of documents that Nintendo seeks to designate as trial exhibits was generated only under the threat of litigation from Alpex, the "clear cut-off point" discussed by the court in *Big O.*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1   The court notes that several commentators have criticized the use of such a strict, objective standard for measuring when a dispute begins for Rule 408 purposes. *See, e.g.,* 23 C. Wright and K. Graham, *Federal Practice and Procedure,* § 5306, at 213-14; Brazil, *Protecting the Confidentiality of Settlement Negotiations,* 39 Hastings L.J. 955 (1988).

`   770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan) 706

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Even were this not the case, there are several other factors that distinguish the **[\*\*12]** communications between Alpex and the four companies that entered into licensing agreements with Alpex without actually being sued, from the business communications at issue in *Big O*. First, the communications in this case took place largely between lawyers. Most of the letters alleging infringement were written by outside counsel for Alpex, a fact that suggests that Alpex believed litigation was a real possibility from the outset of its licensing efforts; many of the responses were written by lawyers for the companies accused of infringement. One court has found that the participation of outside counsel in negotiations is a relevant factor in determining whether a dispute existed for Rule 408 purposes. *Olin Corp., 603 F. Supp. at 450.* Second, the facts of *Big O* suggest that the party seeking to exclude the evidence in that case was guilty of overreaching, and that to apply Rule 408 in that situation would enable that party to succeed in strong-arming an opponent. 23 C. Wright and K. Graham, *Federal Practice and Procedure*, § 5306, at 213-14. No evidence of similar tactics exists in this case.

C. Evidence Relating to License Agreements Reached During **[\*\*13]** Litigation

The final category of documents Alpex seeks to preclude Nintendo from offering at trial pertain to the licensing agreements reached between Alpex and four other companies during ongoing litigation. Numerous Federal Circuit decisions have held that [HN3]offers to license patents made during pending litigation are inadmissible under Rule 408, *see, e.g., Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1556-57, 218 U.S.P.Q. (BNA) 481 (Fed. Cir. 1983); Medtronic, Inc. v. Intermedics, Inc., 799 F.2d 734, 741, 230 U.S.P.Q. (BNA) 641 (Fed. Cir. 1986), cert. denied, 479 U.S. 1033, 93 L. Ed. 2d 836, 107 S. Ct. 882 (1987)*, a fact that Nintendo concedes. Indeed, the Claims Court, surveying the law of the Federal Circuit with respect to the use of offers or settlements to show the prior licensing practices of a patentee and Rule 408, held that "it appears that the majority view of the CAFC is to exclude efforts, offers and settlements directed at compromising a disputed claim." *Dynamics Corp. of America v. United States, 5 Cl. Ct. 591, 223 U.S.P.Q. (BNA) 1308 (1984), aff'd in pertinent part, rev'd in part, 766 F.2d 518, 226 U.S.P.Q. (BNA) 622 (Fed. Cir. 1985).* Nevertheless, Nintendo argues that the **[\*\*14]** unique facts of this case, in which Alpex made "repeated industry-wide offers to license the

patent at a standard price," Nintendo Mem. at 45, and then adhered to those terms even when forced to litigate its claims, compel a different result. Nintendo's argument is unavailing. The mere fact that Alpex offered to settle with a large number of companies does not render the protection afforded such offers under Rule 408 any less applicable. As discussed, *supra*, Alpex accused every corporation to which it offered a license (except Fairchild) of infringing on its patents. It threatened most of them with litigation. The court has previously rejected the distinction that Nintendo attempts to draw between licensing offers made in the context of business negotiations and those that occurred in the context of litigation. That Alpex offered the same terms to those companies it threatened with litigation early in its licensing efforts as it did to those it actually sued is immaterial. Regardless of the terms of the settlements between Alpex and Magnavox, Activision, Tandy, and Coleco, the agreements were made in settlement of litigation; any documents or other evidence relating to these agreements **[\*\*15]** thus plainly fall within the protection of Rule 408.

II. *Waiver of the Rule 408 Privilege*

Nintendo also argues that even if the licenses granted by Alpex during ongoing litigation fall within the scope of Rule 408, Alpex has deliberately waived the protection generally afforded under the rule by disclosing the fact and the terms of its **[\*166]** settlements outside the context of this litigation. More specifically, Nintendo contends that Alpex waived the rule by disclosing information regarding the terms of previous settlements in letters to other companies Alpex alleged were infringing its patents, and with whom it hoped to reach similar settlements. In addition, Nintendo suggests that the fact that the press published details of several of the licensing agreements destroys whatever protection those agreements might have once enjoyed, and thus enables Nintendo offer those details as evidence in this case.

Nintendo bases its waiver argument on Weinstein and Berger, *supra* at p. 5, P 408[2] at 408-20, and one case cited in the treatise, *Bank of America Nat'l. Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339 (3d Cir. 1986). Bank of America* is **[\*\*16]** a case that involved the unsealing of a settlement agreement filed with the court in a related litigation; the case stands for the proposition that "once a settlement is filed in the district court, it becomes a judicial record, and subject to the access accorded such records," and that the policy favoring settlement of disputes does not outweigh that right to access. *Id. at 345.* It has nothing

` 770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan) 706

to do with the admissibility of a settlement agreement under Rule 408. *Id.* at 344. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 The court notes that the one decision it has found that does address this issue dismissed the argument made here by Nintendo out of hand. *See Abundis v. United States*, 15 Cl. Ct. 619 (1988) (fact that settlement a matter of public record does not render Rule 408 inapplicable; court unaware of precedent to support contrary view).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Nor does the Weinstein and Berger treatise provide support for Nintendo's waiver argument. Weinstein and Berger contend that Rule 408 should be treated as **[**17]** a species of privilege, which would permit waiver of the privilege by the parties. "Treating the rule as one of privilege," they argue, "would in no way undermine its policy objectives, because those parties for whose benefit the exclusionary protection was designed, would have to waive the right to have such evidence excluded." Weinstein and Berger, *supra, p. 5*, at 408-20. The primary problem with this argument is that Weinstein and Berger appear to be arguing in favor of some form of permissive waiver, one that would *allow* waiver of the privilege by the parties to the settlement negotiations. They say nothing of the mandatory waiver that can occur in the attorney-client privilege context, an analogy Nintendo implicitly draws. By bringing this motion, Alpex has made clear that it has no desire to waive the protections of Rule 408.

Finally, Nintendo claims that the policy underlying the rule supports its position that the publication of the existence of a settlement or of its details outside of the context of the case at hand should act as a waiver of Rule 408. Although superficially attractive, this argument, too, is unavailing. [HN4]Rule 408 is designed to promote "the public **[**18]** policy favoring the compromise and settlement of disputes." F. R. Evid. 408 advisory committee's note. It is true that complete confidentiality of settlements may promote this goal. But Rule 408 is merely a rule of evidence, which promotes compromise in one limited way -- it provides that evidence of compromise is not admissible to show invalidity of a claim or its amount. "Although the intent of FRE 408 is to foster settlement negotiations, the sole means used to effectuate that end

is a limitation on the admission of evidence produced during settlement negotiations for the purpose of proving liability at trial." *NAACP Legal Defense and Educ. Fund v. Department of Justice*, 612 F. Supp. 1143, 1146 (D. D.C. 1985); *see also Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 122 F.R.D. 447 (S.D.N.Y. 1988). Accordingly, the rule "limits a document's relevance *at trial*, not its disclosure for other purposes." *Center for Auto Safety v. Department of Justice*, 576 F. Supp. 739, 749 (D. D.C. 1983) (emphasis added). The issue of whether a party to a settlement agreement has publicized the existence or the terms of **[**19]** that agreement outside the context of the trial at hand does not enter into a court's decision under Rule 408.

Moreover, it is not at all clear from the facts of this case that Alpex's publicizing **[*167]** of its settlements was inconsistent with either the broad reading courts have traditionally given to Rule 408, or the policy rationale behind the rule. As one commentator has written, "statements made with a clear purpose to resolve the existing dispute should be protected, even though uttered outside the negotiating arena." 2 D. Louisell and C. Mueller, *Federal Evidence* § 171, at 465 (1985). In outlining the terms of previously agreed to settlements in letters to other alleged infringers, Alpex was attempting to resolve disputes, just as it had in letters that did not mention other settlements. The rationale underlying the rule thus actually supports the exclusion of those offers made by Alpex that included details of previous settlements, contrary to Nintendo's contention.

III. *Admission of Alpex's Licensing Offers to Rebut Claim that the '555 Patent Merits Pioneer Status*

[HN5]A pioneer patent is one that "marks a distinct step in the progress of the art . . . as opposed to a mere **[**20]** improvement of prior or analogous techniques." *Shields v. Halliburton Co.*, 667 F.2d 1232, 1238 (5th Cir. 1982). A patent found to have pioneer status merits the application of a broader scope of equivalents in determining whether a particular product infringes the patent. *See Perkin-Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1532, 3 U.S.P.Q.2D (BNA) 1321 (Fed. Cir. 1987). Invoking the provision of Rule 408 that states that [HN6]the rule does not require exclusion when the evidence is offered for a purpose other than "to prove liability for or invalidity of the claim or its amount," F.R.Evid. 408, Nintendo argues that it should be allowed to rebut Alpex's claim to pioneer status for its patent with evidence of Alpex's licensing program. Pointing to affidavits submitted by Alpex's experts in opposition to Nintendo's summary judgment motion, Nintendo

770 F. Supp. 161; 1991 U.S. Dist. LEXIS 9948; 20 U.S.P.Q.2D (BNA) 1782; 33 Fed. R. Evid. Serv. (Callaghan) 706

contends that Alpex will attempt to portray its patent as the foundation of the video game industry. Nintendo hopes to counter that portrayal using evidence of Alpex's licensing program to show that the industry has consistently placed a low value on the patent.

Nintendo thus seeks to take advantage of this provision [**21] of the rule to introduce evidence it is otherwise precluded from offering. This effort faces two hurdles. First, Nintendo has offered little support for the assumption that underlies its argument -- namely, that a determination of pioneer status turns on a showing of commercial success. Indeed, Nintendo does not cite one case in support of this proposition. Second, even identifying a purpose for admission other than the validity of a claim or its amount does not compel a finding in favor of admission. In stating that the exclusion of evidence of compromise is not *required* when it is offered for another purpose, Rule 408 appears to leave to the court's discretion whether that evidence is appropriate. *See Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510-511 (2d Cir. 1989) (trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for "another purpose"); *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106-07 (5th Cir. 1981) ("another purpose" exception to Rule 408 surely not intended to undercut policy behind rule). As one court has written, "it is well recognized . . . that [HN7] [**22] the risks of prejudice and confusion entailed in receiving settlement evidence are such that often Rule 403 and the underlying policy of Rule 408 [to encourage settlement] require exclusion even when a permissible purpose can be discerned." *Stacey v. Bangor Punta Corp.*, 620 F. Supp. 636, 637 (D. Me. 1985) (quoting 2 D. Louisell and C. Mueller, *Federal Evidence* § 170, at 272 (1978)).

Even if this evidence were somehow relevant to the question of pioneer status, the court must still weigh, under F. R. Evid. 403, its probative value against the prejudice that would result from its admission. Because Nintendo has not offered support for its contention that the lack of commercial success of a patent shows that it does not merit pioneer status, the court views the probative value of this evidence to be minimal. At the same time, the danger of prejudice from such evidence is great. It is unlikely that a jury would limit its consideration of this evidence to the purpose Nintendo [*168] proposes; rather, a jury is likely to use it for the improper purpose of gauging the worth of Alpex's claim, and is likely to accord it substantial weight. Therefore, the court will not allow [**23] Nintendo to introduce evidence of Alpex's licensing offers to rebut claims that the '555 was a pioneer patent in its field. The court notes that this ruling with regard to Nintendo's attempts to introduce the licensing offers for rebuttal purposes is preliminary, and that should the evidence at trial warrant a reconsideration of this ruling, Nintendo may raise the issue at that time.

*Conclusion*

For the reasons set forth above, the court grants plaintiff's motion *in limine* to preclude defendants from introducing any evidence concerning Alpex's efforts to compromise disputed claims regarding its patent.

SO ORDERED.

724 F.2d 500; 1984 U.S. App. LEXIS 25607; 14 Fed. R. Evid. Serv. (Callaghan) 1825

Jack BELTON and John Crochet, Plaintiffs-Appellees, v. FIBREBOARD CORPORATION, et al., Defendants, Pittsburgh Corning Corporation, Defendant-Appellant

No. 82-2446

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

724 F.2d 500; 1984 U.S. App. LEXIS 25607; 14 Fed. R. Evid. Serv. (Callaghan) 1825

February 9, 1984

**PRIOR HISTORY:** [**1]

Appeal from the United States District Court for the Eastern District of Texas.
**DISPOSITION-1:** Reversed and Remanded.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant asbestos manufacturer appealed a judgment of the United States District Court for the Eastern District of Texas, which entered a jury verdict in favor of plaintiff injured parties. The trial court informed the jury, in spite of Fed. R. Civ. P. 408, of the amounts of plaintiffs' previous settlement agreements with other co-defendant asbestos manufacturers.

**OVERVIEW:** Plaintiff injured parties brought a strict liability action against defendant asbestos manufacturer for damages from their exposure to asbestos. Plaintiffs had already settled with 15 other co-defendant asbestos manufacturers and the trial court informed the jury of the amounts of the previous settlements, encouraging the jury to add its desired amount on top of those figures so that plaintiffs would not be in a position where "they wouldn't get anything." Defendant appealed and the court reversed and remanded for a new trial, finding that the trial court's action violated Fed. R. Civ. P. 408 because it introduced evidence from settlement agreements for the purpose of establishing the amount of a claim. The court further found that the action constituted an impermissible comment on an ultimate factual issue.

**OUTCOME:** The court reversed and remanded the judgment awarded to plaintiff injured parties on their suit against defendant asbestos manufacturer. The court concluded that the trial court erred by admitting evidence of the amount of pre-trial settlements by other asbestos manufacturers, and by expressing its opinion on the amount of damages, because it went to an ultimate issue of fact.

**CORE TERMS:** settlement, dollar, reconsider, deduct, co-defendant, deliberation, pre-trial, disregarding, deliberate, deducted, exposure, awarding,

adjudged, retired, wished, abuse of discretion, offered to prove, total amount, misunderstood, entitled to receive, settlement amount, refused to accept, unanimous verdict, judicial comment, amount of money, total sum, new trial, negotiations, admissible, invalidity

**LexisNexis(TM) Headnotes**

*Evidence > Relevance > Compromise & Settlement Negotiations*

*Civil Procedure > Appeals > Standards of Review > Plain Error*

[HN1]Fed. R. Civ. P. 408 by its terms does not operate to exclude evidence unless it is offered to prove liability for or invalidity of the claim or its amount. Whether to admit evidence for another purpose is within the discretion of the trial court; the court's decision will not be reversed in the absence of an abuse of discretion amounting to manifest error.

*Civil Procedure > Jury Trials > Jury Deliberations*

[HN2]In a federal trial, the judge has the right to comment on the evidence, but may not comment on the ultimate factual issues to be decided.

**COUNSEL:** Gordon R. Pate, Beaumont, Texas, Joe Michael Dodson, Beaumont, Texas, Don Martinson, Dallas, Texas, for Appellant.

For Belton: Walter Umphrey, Port Arthur, Texas, Joseph R. Steele, Port Arthur, Texas, for Crochet: Marlin Thompson, Orange, Texas, Paul D. Henderson, Orange, Texas, for Appellee.

**JUDGES:** Politz, Johnson and Williams, Circuit Judges.

**OPINIONBY:** PER CURIAM

**OPINION:** [*501] The threshold of this appeal concerns the admissibility of evidence of settlement agreements and the permissible boundaries of fair judicial comment to the jury. n1 Concluding that the trial court erred by admitting evidence of the amount of pre-trial settlements by a number of co-defendants,

724 F.2d 500; 1984 U.S. App. LEXIS 25607; 14 Fed. R. Evid. Serv. (Callaghan) 1825

and by expressing its opinion on the amount of damages, we reverse and remand for a new trial.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 Appellant also raises two procedural issues on appeal. First appellant urges that the trial court erred in admitting into evidence a Louisiana court's file in an unrelated case filed in 1961 against various manufacturers of asbestos products, listing appellant as a defendant at a time before it was ever in the business of manufacturing an asbestos product. Second, it is argued that the trial court erred in admitting a letter signed by Doctor Ervin J. Selikoff into evidence. The gravamen of that argument is that the letter was hearsay, not properly authenticated, and that its admission deprived appellant of its right of cross-examination. We have reviewed these contentions and find them to be without merit.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[**2]

*Background*

The facts are undisputed. The plaintiffs, Jack Belton and John Crochet, filed this diversity action against appellant Pittsburgh Corning and fifteen other defendants, alleging that their exposure to asbestos-containing products manufactured by the defendants caused them to develop asbestos-related diseases. Prior to trial, Belton settled with fifteen defendants for $259,843.88; Crochet settled with thirteen defendants for $145,398.42. Pittsburgh Corning, the appellant here, was left as the only non-settling defendant.

At a pre-trial conference, the district court ruled that if Pittsburgh offered evidence of the plaintiffs' exposure to the products of the fifteen settling defendants, then the plaintiffs could explain to the jury that the other defendants were not at trial because they had theretofore settled out of court. Pittsburgh indicated, at a point during plaintiffs' opening statement, that it did intend to offer evidence of plaintiffs' exposure to the products of the previously settling defendants. The case proceeded to trial on a theory of strict liability. During opening statements, counsel for Belton and Crochet advised the jury that fifteen of the [**3] original defendants had settled prior to trial. The record reveals that the jury heard [*502] conflicting evidence as to the severity of Belton's and Crochet's injuries.

At the conclusion of the evidence, the trial court instructed the jury not to consider the settlement in its deliberations:

The Court would charge you that you are not to permit the question of settlement of the Plaintiffs prior to the trial of this case, as to affect you in any way in regard to the liability that the Defendant has in regard to damages to the Plaintiff. You will not consider the settlement made by the Plaintiffs with other Defendants in any regard. But, the Court would instruct you that you are to give full consideration to the damages the Plaintiffs have sustained as if they were suing only the Defendant, Pittsburgh Corning Corporation. In other words, you will award the Plaintiffs the full damages which you find that they have sustained as a result of their asbestosis condition or their illness as a result of the exposure to asbestos products. You will not reduce or diminish or deduct any monies for any settlement that they might have made for other Defendants, because this will [**4] be a matter that they might have made for other Defendants, because this will be a matter that the Court will be required to pass upon. Any amount that you would award the Plaintiffs as damages, the Court would have to make such adjustments and reduce the amount by the previous settlements.

These are matters to be handled by the Court. So, the fair way for you to award damages would be to award full damages to the Plaintiffs for all of the injuries that you find that they have sustained and all of the compensation that they are entitled to receive for their asbestosis illness, and not be effected or influenced in any way by any previous settlement. Or to make any deductions or reduce the amount by whatever settlement you might anticipate that they might have made, because this is a matter for the Court's consideration and for the Court's action and the Court, of course, will take care of that situation.

The jury returned a unanimous verdict awarding Belton $25,000 and Crochet $75,000. The Court did not accept the verdict but instead asked:
THE COURT: Let me see it back Mr. Foreman, and members of the Jury, the Court would make this inquiry. Are you aware of [**5] the fact that the amount of damages that you have awarded the

724 F.2d 500; 1984 U.S. App. LEXIS 25607; 14 Fed. R. Evid. Serv. (Callaghan) 1825

Plaintiffs, that the settlement with the other Defendants will have to be deducted from these amounts? In other words, if the amount of settlement made with the other defendants would exceed Twenty-Five Thousand Dollars as to Mr. Belton, or Seventy-Five Thousand Dollars as to Mr. Crochet, then the Plaintiff would not get any recovery at all from this Defendant. Are you aware of that fact?

> THE FOREMAN: No, we were not.
> THE COURT: And with that information, do you wish to reconsider? In other words, the Court advised the Jury, I presume this is the amount that you feel that they should recover from the Defendant; is that correct?
> THE FOREMAN: Yes, Your Honor.
> THE COURT: Is that the wish of each of you?
> (All Jurors indicating, "Yes".)
> THE COURT: Well, the reason the Court is telling you, because we like to give effect to the verdict of the Jury. We would like for their will to prevail, and of course, this would be a useless effort if the Court accepted this verdict in the manner in which you have returned it, because the Plaintiffs would not -- they would get zero and they wouldn't get anything.

The Court would [**6] therefore tell you there are some fifteen defendants have already settled with the Plaintiffs, and as I say, the amount of money that they have settled for would exceed the amount of money that you have found in this case against the Defendant. The law would require the Court to deduct the amount of settlement that has been made, so these Plaintiffs would not get anything.

If you wish to go back and reconsider and consider the case as the Court advised you may do originally yesterday [*503] when we gave you the charge, and also this morning, consider it as if none of the defendants have -- that Pittsburgh Corning is one, and that no settlements have been made from any of them, that there was only one party, then adjudge the damages in accordance with what you find the injuries to be worth in dollars and cents that the Plaintiffs are afflicted with or have sustained, disregarding any other settlements.

Now, do you wish to do that? Do you wish to return to the Jury Room and begin your deliberations for that purpose? The Court will permit you to do so if you wish to.

> THE FOREMAN: Yes.

The record reveals that appellant's counsel interrupted this exchange and moved [**7] that the trial court receive the jury's verdict. The trial court denied this motion, going on to further instruct the jury that:

> The Court knows of no other way to do this, other than for you to reconsider the amount of damages, disregarding the other defendants and the settlements, because the Court would have to deduct those under the law. So, we are not at liberty to tell you what those are, or we would. So, the only way the Court can advise you, the only fair way that you can award damages to the Plaintiffs, is to consider what you think their injuries are worth in dollars and cents, disregarding any previous settlements by other defendants.
>
> Now, in addition to that, if you wish to indicate on the verdict after finding the amount of damages, that you think they are entitled to, if you wish to also indicate that we think that certain proportions of this amount of damages that we find that the Plaintiffs is entitled to receive should be adjudged against this Defendant. Do you understand what I'm saying? In other words, if you would say in percentages or the amounts that should be adjudged against these defendants, you just have to write that into the verdict underneath [**8] it, saying that we feel that a certain percentage of this amount should be adjudged against the Defendant, Pittsburgh Corning, either in the amount or the percentage.

At this point, appellant's counsel objected again to no avail. The jury then retired and returned with a second signed unanimous verdict awarding Belton $125,000 and Crochet $275,000. The trial court once again refused to accept the jury verdict, and instead decided to tell the jury the amount that each plaintiff had received in settlement from the other defendants:

> Now, in view of the efforts that you have made, I feel that the Court should give you the information of the settlement made with the defendants who have settled in this case, in the event that you would like to reconsider your verdict.

724 F.2d 500; 1984 U.S. App. LEXIS 25607; 14 Fed. R. Evid. Serv. (Callaghan) 1825

The total amounts of settlement received by the Plaintiff, Jack Belton, from fifteen defendants, is Two Hundred Fifty-Nine Thousand Eight Hundred Forty-Three Dollars and Eighty-Eight Cents, ($259,843.88). If the Court accepted this verdict of $125,000, the Court would have to deduct the $259,843.88 from $125,000, which you could not deduct.

Now, if you had indicated, as you did in your first verdict, [**9] that you wish the Plaintiff, Belton, to receive $25,000 from the Defendants, Pittsburgh Corning, and the Plaintiff, Crochet, $75,000 from the Defendant, Pittsburgh Corning, then, of course, the effect of your verdict is to allow nothing for Mr. Belton. As to Mr. Crochet, thirteen defendants have paid a total of One Hundred and Eighty-Nine Dollars and Forty-Two Cents ($145,389.42). So, you would deduct $145,389.42 from $275,000 and you would arrive at One Hundred Thirty Thousand Dollars ($130,000), which your verdict would award Mr. Crochet some damages.

Now, I feel that in all fairness, since you have indicated originally that you wished the Plaintiff to recover in the amount that you indicated from the Defendant, that the Court should give you these figures and the number of defendants that have settled and for you, one [*504] more time, to make an effort at returning a verdict.

Now, the reason for this is that we have spent considerable time trying this case. And that we want to salvage some benefit from the trial. If your verdict has been for the Defendant, of course, the Court would not have asked you to reconsider at all if it had been for the Defendant and against [**10] the Plaintiffs. But, it is obvious to the Court that it is the Jury's desire to find for the Plaintiff in some amount of damages. And this is the reason that we are going to the extent that we have. So, I am going to give the verdict back to you one more time and I will give you the figures that the Plaintiffs have -- that the parties have stipulated in the record as the amount of settlement made by the Defendants, with which the Plaintiffs have settled.

I also would like for you, in order to make certain, to indicate underneath the verdict the amount that you enter, the amount also that you would like for each of the Plaintiffs to recover from this particular Defendant, Pittsburgh Corning so that then we will have no question about the will of the Jury.

Do you understand what the Court is telling you?

THE FOREMAN: Yes, Your Honor.
THE COURT: . . . .

This is strictly your verdict, not the Court's verdict or anyone else's verdict. It is your verdict. If you do not want to change it, that is your privilege; but, if you would like to change it, the amount, well, then you will have the privilege of doing so and the Court will grant you that privilege.

Now, the Court is [**11] giving you the original form of verdict with the additional information of the settlement made by the Plaintiffs with the other defendants. You understand, of course, that you do not have to reconsider further or change the figures which you have indicated that the Plaintiffs are entitled to, or you might change one and might not change the other. This is strictly within your discretion.

Now, the Court would inquire, does the Jury wish to deliberate further, in view of the further instructions that the Court has given you?

THE FOREMAN: Yes.
THE COURT: It is the wish of each of you?

The jury is indicating it is, it is unanimous and the Court will furnish you this information and return the verdict to you.

The jury then retired and returned with a third verdict, awarding $284,843.88 to Belton and $220,398.42 to Crochet. Pursuant to the trial court's instructions, the jury noted at the bottom of the verdict form, "we the jury assess $25,000.00 of the total sum to be paid to Jack Belton and $75,000.00 of the total sum to be paid John E. Crochet by Pittsburg [sic] Corning Corporation."

The settlement figures along with the following summary of the jury deliberation [**12] proceedings are instructive.

724 F.2d 500; 1984 U.S. App. LEXIS 25607; 14 Fed. R. Evid. Serv. (Callaghan) 1825

|  | Belton | Crochet |
|---|---|---|
| Prior settlements | $ 259,843.88 | $ 145,398.42 |
| Jury's first verdict | 25,000.00 | 75,000.00 |
| Amount which plaintiff would have received under jury's first verdict | -0- | -0- |
| Jury's second verdict | 125,000.00 | 275,000.00 |
| Amount which plaintiff would have received under jury's second verdict | -0- | 129,610.58 |
| Jury's third verdict | 284,843.88 | 220,398.42 |
| Amount which plaintiff would have received under jury's third verdict | 25,000.00 | 75,000.00 |

There are two matters of particular interest to note. First, that the amount of the first verdict was determined by the jury with knowledge of the plaintiffs' prior settlements with the other defendants but no knowledge of the actual amounts involved. Second, that the court's supplemental instructions to the jury resulted in the amounts the plaintiffs would have received under the jury's third verdict being equivalent to the amounts awarded in the first verdict.

I.

Pittsburgh Corning contends that the admission of evidence of the settlement [*505] by the fifteen co-defendants violated Fed. R.Evid. 408. Rule 408 provides:

> Evidence of (1) furnishing [**13] or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromised negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

[HN1]
Rule 408 by its terms does not operate to exclude evidence unless it is offered to prove "liability for or invalidity of the claim or its amount." See also Advisory Committee Notes, Fed.R.Evid. 408. Whether to admit evidence for another purpose is within the discretion of the trial court; the court's decision will not be reversed in the absence of an abuse of discretion amounting [**14] to "manifest error." Reichenbach v. Smith, 528 F.2d 1072, 1074 (5th Cir.1976).

The trial court's ruling that the fact of settlement by fifteen co-defendants was admissible did not violate Rule 408 because the evidence was not offered to prove liability or the amount of damages. Because Pittsburgh Corning intended to prove that Belton and Crochet had been exposed to the products of the other defendants, the trial court decided that the settlement evidence was necessary for the purpose of explaining why those parties were not in court. The court duly charged the jury that it was not to consider the evidence in reaching a verdict. In Reichenbach, 528 F.2d at 1074-75 and n. 10, we affirmed the district court's decision to exclude the evidence of a settlement because it would tend to confuse the jury. Similarly, in the instant case, we hold that the trial court's admission of the evidence to prevent confusion of the jury was not an abuse of discretion.

II.

The court's instructions on the settlement amount, however, given after the jury had reached a verdict, do not fall within any exception to Rule 408. When the trial judge received the first [**15] verdict, he instructed the jury that the amount of the settlement would be deducted from it and, because the amount of the verdict was less than that of the settlement, the plaintiffs would receive nothing. In light of this information, the jury agreed to deliberate again. When it returned a second, larger award, the court refused to

accept it; instead, the court revealed the dollar amounts of the settlements and instructed the jury to add to these figures any damages they wished the plaintiffs to receive from the defendant.

These instructions violated Rule 408 because they directed the jury to consider the settlement as part of the proof of the amount of the claim. Cf. *McHann v. Firestone Tire & Rubber Co.*, 713 F.2d 161, 166-67 (5th Cir.1983) (instruction that jury should deduct amount of pre-trial settlement from verdict violates Rule 408 because jury may believe large settlement by co-defendant to be proof that only co-defendant, and not defendant, was negligent). After the jury returned its first verdict, the court specifically asked it to base its award on consideration of the settlement, and the jury did so. This was error.

III.

Pittsburgh Corning [**16] also contends that the trial court's instructions to the jury were impermissible comments on an ultimate issue of fact: the amount of damages. [HN2]In a federal trial, the judge has the right to comment on the evidence, but may not comment on the ultimate factual issues to be decided. *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 761 (5th Cir. 1979); *see Quercia v. United States*, 289 U.S. 466, 470, [*506] 53 S. Ct. 698, 699, 77 L. Ed. 1321 (1933). We have observed that "by reason of his role, quickly observed by jurors, the judge is a figure of overpowering influence, whose every change in facial expression is noted, and whose every word is received attentively and acted upon with alacrity and without question." *Travelers Insurance Co. v. Ryan*, 416 F.2d 362, 364 (5th Cir.1969).

The instant case illustrates the force of these observations. It appears that when the district judge received the first verdict he concluded that the jury had misunderstood the charge. At this point he was free to ask the jury members whether their verdict was intended to reflect the total amount of the plaintiffs' damages, to reinstruct them, [**17] and to allow them to deliberate further. n2 *University Computing v. Lykes-Youngstown Corp.*, 504 F.2d 518, 547 (5th Cir.1974); *see* Rule 49(b), Fed.R.Civ.P., and *Stewart v. Atlantic Pipeline Co.*, 470 F.2d 738 (5th Cir.1972), *modified*, 479 F.2d 311 (1973) (further deliberations allowed where interrogatories in conflict and verdict inconsistent with instructions). The district judge went further, however, and expressed his opinion on the factual question of damages.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n2 Alternatively, he could have ordered a new trial. *Stewart v. Atlantic Pipeline Co.*, 479 F.2d 311, 312 (5th Cir.1973).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

The district judge first inquired whether the jury was aware that the amount of the pre-trial settlement would be deducted from its award, then asked the leading question, "I presume this is the amount that you feel that they should recover from the defendant; is that correct?" When the foreperson agreed, the judge stated that it would be "a useless [**18] effort" to accept the verdict because the plaintiffs "would get zero and they wouldn't get anything." When the jury returned with the second verdict the district judge again presumed that the award did not reflect the plaintiffs' actual damages and invited the jury to reconsider, stressing his opinion that it was the jury's intent that Belton and Crochet collect $25,000 and $75,000 respectively in addition to the settlement. The court instructed the jury that, in order to accomplish this intention, they must add the figures to the settlement amount to arrive at a total verdict. When the jury members returned their third verdict they had done precisely what the district judge had presumed they wished to accomplish.

On these facts, there can be no hesitation in concluding that the trial court encouraged a verdict, and in so doing invaded the jury's fact-finding function. When the jury first retired, it did not request additional instructions or indicate that it had misunderstood the court's charge. It was only after the suggestion was made by the court that the award reflected only the present defendant's portion of the damages, rather than the total amount, that the jury agreed [**19] that further deliberations were necessary. Although the district judge told the jury members that their verdict was strictly up to them, he also asserted that "it is obvious . . . that it is the jury's desire to find for the Plaintiffs in some amount of damages." The judge's statements here, and the other instructions following the return of the first two verdicts, were outside the permissible scope of fair judicial comment. Upon consideration of those instructions and the jury's obedience to their direction, it is clear that the verdict upon which the judgment appealed from was entered did not represent the views of an impartial jury.

For the reasons indicated the judgment is

REVERSED AND REMANDED.